# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH RATRA, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>RALPH LAUREN CORPORATION, a Delaware corporation, RALPH LAUREN RETAIL, INC., a Delaware corporation, and DOES 1-50, inclusive,<br><br>    Defendants. | Case No. 1:24-cv-4816<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Sarah Ratra ("Plaintiff") brings this action**,** on behalf of herself and all others similarly situated**,** against Defendants Ralph Lauren Corporation and Ralph Lauren Retail, Inc. (collectively, "Defendants"), and states:

## I.  NATURE OF ACTION

1.  "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Ralph Lauren's Polo Factory Store outlet ("Polo Factory") fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendants lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.      At all relevant times, Defendants have continually advertised false price discounts for merchandise sold throughout their Polo Factory outlet stores.[2] In bringing this putative class action complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks monetary damages, restitution, and declaratory and injunctive relief from

---

[1] "[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992); "[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value." Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994).

[2] In the early 1970s, Ralph Lauren began as a high-end luxury fashion and apparel store, opening its first freestanding retail store on Rodeo Drive in Beverly Hills, California. Over the years, Ralph Lauren evolved and became known for the marketing and distribution of premium lifestyle products in four categories: apparel, home, accessories, and fragrances. Within its clothing apparel segment, Ralph Lauren offers a variety of brands including Polo Ralph Lauren, Ralph Lauren Purple Label, Ralph Lauren Collection, Lauren Ralph Lauren, Double RL, Ralph Lauren Childrenswear, Denim & Supply Ralph Lauren, and Chaps. Ralph Lauren sells its luxury and upscale brands almost exclusively at its Ralph Lauren, RRL, and Polo Ralph Lauren retail stores.

In an effort to increase their market share, Defendants position their Polo Ralph Lauren brand as an affordable alternative to their luxury brand products. The Polo Ralph Lauren brand mimics the designs of Defendants' more prestigious luxury brands but offers lesser-quality products at significantly lower price points to consumers. Ralph Lauren's luxury brands are sold exclusively at their high-end stores, Ralph Lauren, RRL, and Denim & Supply. In contrast, with very limited exceptions, Defendants sell the Polo Ralph Lauren brand clothing exclusively at their Polo Factory outlet stores located in outlet malls.

Defendants arising from their false discounting scheme on women's apparel, accessories, shoes, and other items sold in their Polo Factory outlet stores.

4.     False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the true market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[3] Consequently, false reference pricing schemes enable retailers, like Defendants, to sell products above their true market price and value, leaving consumers to pay the inflated price, regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.     The following example of a hypothetical DVD seller, which parallels Defendants' practice, illustrates how false reference pricing schemes harm consumers: the DVD seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at **_90% off_**, creating a (fake) "sale" price of $10.00. Consumers purchasing the DVD for $10.00 assume they got a "good deal" since the DVD was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

---

[3] Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

6.      The consumer's presumption and purchase stem directly from the seller's deception. For example, if the seller tried to sell that same DVD for $10.00 *without* referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell many, if any, DVDs at $10.00 because the true, market value of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers will purchase the DVD at $10.00. By doing so, the seller has fabricated an artificial and illegitimate increase in consumer demand for the DVD through the reasonable, but incorrect, *perceived value* of the DVD in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD, based on the false discount, in turn creates a new, albeit artificial and illegitimate, market price of the DVD. The seller can therefore create an artificially inflated market price for the DVD of $10.00 by advertising the false "original" price and corresponding fake discount.

7.      Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continue to violate, California and federal law. Specifically, Defendants violated and continue to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (the "CLRA"); and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.      Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more of Defendants' outlet items advertised a purported discount from a fictitious higher reference price from Defendants' Polo Factory outlet stores.

Plaintiff intends to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendants from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable damages, including actual, benefit of the bargain, statutory and punitive damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendants were unjustly enriched as a result of their sales of merchandise offered at a false discount.

## II.     JURISDICTION AND VENUE

9.      This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class (defined below) have a different state citizenship from Defendants.

10.     The Southern District of New York has personal jurisdiction over Defendants because both Defendants Ralph Lauren Corporation and Ralph Lauren Retail, Inc. are Delaware corporations or other business entities which do conduct business in the State of New York and have principal executive offices located in New York, New York. Defendants conduct sufficient business with sufficient minimum contacts in New York, and/or otherwise intentionally avail themselves to the New York market through the operation of Polo Factory outlet stores within the State of New York.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District.

### III.    GENERAL ALLEGATIONS

**A.    Retailers Benefit from False Reference Pricing Schemes.**

12.    Defendants engage in a false and misleading reference price scheme in the marketing and selling of their Polo Factory merchandise at their Polo Factory outlet stores.

13.    As mentioned above, retailers like Defendants can benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get ***higher margins***, but also ***increase sales***." Staelin et al., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[4] Most often, as with retail clothing, consumers lack full information about products and, as a result, often use information from sellers to make purchase decisions.[5]

14.    Defendants' deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[6] In other words, consumers view Defendants' deceptive advertised reference prices as a

---

[4] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16, no. 1 (1973): 67-88, pp. 68-69.

[5] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-29, pp. 311-12.

[6] Grewal, Dhruv, and Larry D. Compeau. "Comparative Price Advertising: Informative or Deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. *Also see* Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is

proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[7] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[8] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[9]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[10] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[11] Researchers report that

---

purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[7] Grewal, Dhruv, and Larry D. Compeau. "Comparative Price Advertising: Informative or Deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 52.

[8] Peter Darke and Darren Dahl. "Fairness and Discounts: The Subjective Value of a Bargain." *Journal of Consumer Psychology* 13, no 3 (2003): 328-338, p. 328.

[9] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'". Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205.

[10] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

[11] Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 62.

consumer's internal reference prices adjust toward external reference prices when valuing a product.[12] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[13] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[14] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[15] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][16]

---

[12] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

[13] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212.

[14] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[15] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161. *See also* Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at pp. 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[16] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

16.    In Staelin, *Regulation of Fictitious Pricing*, published just this year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[17] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.    Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[18] According to Staelin and his co-authors "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 2. *See also id.* at 12 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendants, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendants' advertisements, consumers are not receiving *any* discount and are actually *overpaying* for

---

[17] *See* Staelin*, Regulation of Fictitious Pricing* (manuscript at 3) ("It is now well established that many consumers get extra utility beyond that associated with consuming the product from purchasing it on deal (Thaler 1985, Compeau & Grewal 1998, Krishna et al. 2002) and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

[18] Staelin et al., *supra*, at 826 (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

Defendants' product because, as Staelin et al. put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***.") *Id.* at 835 (emphasis added).

**B.    Defendants Engage in a Fraudulent Price Discounting Scheme**

19.    For years, Defendants have engaged in a fake discounting scheme that harms consumers by advertising their Polo Factory outlet merchandise at discounted "sale" prices in their Polo Factory outlet stores. In short, Defendants market the "sale" prices as discounts from the original or "ticket" prices listed on the products' price tags for Polo Factory merchandise sold at the Polo Factory outlets. In most cases, the items are each accompanied by a placard sign immediately above or below them[19] advertising a "__% Off" of the original, ticketed reference price. In other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price tag price. The discount placard signs are printed on white card stock with bold, black lettering advertising the fake discount.

20.    The photos below demonstrate Polo Factory's uniform storewide practice in place at all Polo Factory outlets:[20]

---

[19] In other cases, such as with table displays, the discount sign applies to several, typically similar, items.

[20] *See also* **Exhibit A**, additional Polo Factory in-store photographs depicting the extent and pervasiveness of Defendants' pricing scheme.

 

21.     As can be seen in the above photos and in **Exhibit A**, Defendants' "original" or "ticket" prices are unadorned by any qualifying language that could arguably direct consumers to compare its reference/sales prices to any other market outside of Defendants' own outlet or mainline stores. This reasonably impression is reinforced by Defendants' pervasive use of "__% OFF" advertisements, which denote limited time discounts from *former* prices.[21] Thus, Defendants do not advertise any "discounts" from any other stores Polo Factory merchandise. Additionally, Plaintiff is informed and believes and thereon alleges that much of the merchandise sold at Polo Factory outlets is manufactured exclusively for the Polo Factory outlets.[22] Likewise, in the case of

---

[21] *See Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

[22] *See, e.g.,* Ralph Lauren Corporation, Annual Report (Form 10-K), at p. 9 (May 23, 2024) ("2024 10-K") ("Our Ralph Lauren stores feature a broad range of apparel, footwear & accessories, watch and jewelry, fragrance, and home product assortments in an atmosphere reflecting the distinctive

any out-of-season mainline merchandise offered at the Polo Factory outlet stores, the reference prices accompanying those items are *not*: (1) actual, bona fide former prices; (2) recent, regularly offered former prices; or (3) prices at which identical products are regularly sold, or have been recently sold, elsewhere in the market. This is because the items are old and outdated.[23]

22.     Moreover, Defendants do not make "Compare At" pricing representations. In those schemes an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Accordingly, Plaintiff is *not* required to "'assert evidence from which a rational trier of fact could infer that the comparative reference price was inaccurate[,]'" *Harris v. PFI W. Stores, Inc.*, No. SACV192521JVSADSX, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling*, 291 F. Supp. 3d at 1085-86), because, "th[at] situation **only arises when the language of the advertisement implies a comparison to another retailer**. *Id*. (citing *Horosny v. Burlington Coat Factory of California, LLC*, No. CV1505005SJOMRWX, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added). Both Defendants' exclusive and non-exclusive outlet items bear ticket prices unaccompanied by any qualifying language that would reasonably indicate a comparison to another market, and so consumers are not put on notice to seek out those comparisons. Thus, it is irrelevant to Defendants' liability whether the outlet items are sold in other markets, like department stores.

23.     Nor do Defendants disclose any date on which the "original" prices last prevailed in the market. The omission of these material disclosures, coupled with Defendants' use of fake reference and sale prices, renders Defendants' pricing scheme inherently misleading to reasonable consumers, like Plaintiff,[24] who has no way meaningful way of discerning that Defendants' pricing

---

attitude and image of the Ralph Lauren, Polo, and Double RL brands, including **exclusive merchandise** that is not sold in department stores.") (emphasis added).

[23] *See* 2024 10-K at p. 10 (outlet stores "serve as a secondary distribution channel for our excess and out-of-season products.").

[24] Claims brought pursuant to the UCL and CLRA are "governed by the 'reasonable consumer' test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "Where, as here, the reasonable consumer test applies to plaintiff's underlying [false discount pricing] claims, it is a

representations are deceptive without substantial, time-consuming, and costly investigation before *every* purchase. Consequently, the discounts advertised throughout Polo Factory Stores are fake and used fraudulently to induce consumers to make purchases and spend more under the reasonable, but incorrect, belief that the discounts are genuine.

24.    Even if Defendants did sometimes offer the outlet products at their full reference price (which they do not), that offering would do little to legitimize Defendants' practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public ***on a regular basis for a reasonably substantial period of time***." 16 C.F.R. § 233.1(a) (emphasis added). Nor would such rare offerings constitute the "prevailing market price"[25] within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendants also fail to do on *all* advertisements. Rather, the advertised reference prices on Polo Factory merchandise are *not* the price at which Defendants regularly (or ever) sell, or expect to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

25.    In sum, Defendants' fake discount scheme is intended to increase sales while depriving consumers of the benefit of their bargain.[26] Indeed, this conduct deprives consumers of

---

'rare situation in which granting a motion to dismiss is appropriate.'" *Rubenstein*, 687 F.App'x. at 566 (citing *Williams*, 552 F.3d at 939). Numerous courts analyzing allegations of false discount pricing have likewise held that the "reasonable consumer" challenges are inappropriate on the pleadings. *See, e.g.*, *Inga v. Bellacor.com, Inc.*, No. 219CV10406MWFMRW, 2020 WL 5769080, at *3 (C.D. Cal. July 17, 2020) (citing *Williams*, 552 F.3d at 939); *Chester v. TJX Companies, Inc.*, No. 515CV01437ODWDTB, 2016 WL 4414768, at *10 (C.D. Cal. Aug. 18, 2016); *Horosny*, 2015 WL 12532178, at *4.

[25] *See generally*, *people v. Super. Ct. (J.C. Penney Corp., Inc.)*, 34 Cal. App. 5th 376, 410-13 (2019) (where certain items are sold by only one retailer, the "prevailing market price" is the most "common," "predominant," or "most widely occurring" price at which items are sold by that retailer) (citing authorities).

[26] Staelin *et al.*, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information.

## C.   Defendants' Fraudulent Price Discounting Scheme Harms All Consumers

26.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[27] Empirical studies thus "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[28] Consumers are misled and incorrectly overvalue Defendants' Polo Factory outlet stores' products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendants to command inflated prices beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumers behavior, as well as the resulting from *false* references prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[29]

---

[27] Thaler, Richard, "Mental Accounting and Consumer Choice," *Marketing Science* 4, no. 3 (1985): 199-214, at p. 212.

[28] Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at p. 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at p. 60.

[29] Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, at p.46.

27.    Accordingly, all consumers who purchase Polo Factory merchandise are harmed by Defendants' pricing scheme because its impact pervades the entire market for Polo Factory outlet merchandise. This is because, again, the artificially increased demand generated by Defendants' pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al.*, *supra*, at 835. Thus, all Polo Factory outlet shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendants' Polo Factory merchandise. All consumers who purchase falsely discounted Polo Factory outlet products have overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

28.    To put it differently, the fake discount information presented by Defendants' false advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[30] on their Polo

---

[30] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'." Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205; Dhruv, Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

Factory outlet purchases, which they would not have otherwise gained but for Defendants' fake discounting scheme. Consumers' valuation of Polo Factory outlet merchandise therefore increases in the aggregate.

29.     Fundamental economics concepts and principles dictate that the harm caused by Defendants' scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived Polo Factory outlet shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[31] The aggregate demand curve for a product, including Defendants', represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

30.     As a result, Defendants' pricing scheme impacts the market prices of their Polo Factory outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Polo Factory outlet prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class members thus suffered a common impact from Defendants' misconduct.

---

[31] "[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace" (Mankiw, N., *Essentials of Economics.* Eighth Edition. Boston, MA: Cengage Learning, 2015, at p. 66). *See also,* Varian, Hal R. *Microeconomics Analysis.* Third Edition. New York, New York: W. W. Norton & Company, 1992, at pp. 23-38, 144-157, 233-353, and 285-312.

### D.    Investigation

Plaintiff's counsel has been investigating Polo Factory outlet stores since February 2022. Since then, Plaintiff's counsel has monitored Defendants' Polo Factory outlet store prices in California, New York, and Oregon. The pricing scheme (i.e., the manner in which the reference prices and purported discounts were conveyed to shoppers) was uniform and identical across all stores visited. The only thing that changed was the requisite % off on certain merchandise items. In other words, all items had price tags that were then perpetually "discounted" by in-store signage indicating a large percentage off ("__% Off") or whole-price reduction discount.

Additionally, every product observed in Defendants' Polo Factory outlet stores remained "on sale" for the duration of this tracking period, discounted against a false reference price. Attached as **Exhibit B** is a list of exemplar products from the investigation.[32] As mentioned above,

---

[32] Notably, numerous false discount pricing cases in the Ninth Circuit hold that plaintiffs are not required to provide *any* specific details of pre-suit investigations in false discount pricing cases. *See, e.g.*, *Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot "reasonably be expected to have access," her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2016 WL 1730001, at *3–4 (N.D. Cal. May 11, 2017) (finding that the plaintiffs' complaint satisfied Rule 9(b) even though the plaintiffs had not plead a pre-suit investigation) (citation omitted); *Knapp*, 2016 WL 3268995, at *4 (finding that the plaintiff's allegations of a "perpetual sale" were alone sufficient); *Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold); *Horosny*, 2015 WL 12532178, at *4 (denying a motion to dismiss where the plaintiff pled a deceptive pricing scheme "on information and belief" and not based on a pre-suit investigation); *see also Branca*, 2015 WL 10436858, at *7 (finding the plaintiff adequately alleged "why the 'Compare At' prices are false as former prices—because they necessarily cannot be former prices or prevailing market prices, as the items were never sold elsewhere for any other price besides the Nordstrom Rack retail price").

Arguments attacking the sufficiency of Plaintiff's pre-suit investigation *pleading* allegations at the pleadings stage are, in actuality, premature challenges to Plaintiff's *factual allegations* in an

**Exhibit A** includes numerous in-store photographs taken during the investigation showing the extent and uniformity of Defendants' pricing scheme at its Polo Factory outlets.

31.    Indeed, the investigation indicated that the Polo Factory merchandise is never offered for sale at its full "original" price—and certainly are not "on a regular basis for a reasonably substantial period of time," as required by 16 C.F.R. § 233.1.[33]

---

attempt to mask those fact-based disputes as particularity concerns under Rule 9(b). Such attempts should be rejected as such a requirement would "raise the pleading standard of Rule 9(b) to unprecedented heights." *See Jacobo v. Ross Stores, Inc.*, No. CV-15-04701-MWF-AGR, 2016 WL 3483206, at *3 (C.D. Cal. June 17, 2016) ("But no authority requires [p]laintiffs to include that information in the pleadings; arguably that level of evidentiary detail would be improper, even under Rule 9(b).").

Still, complaints containing similar pre-suit investigation allegations, like Plaintiff's here, have routinely been sustained at the pleading stage. *See, e.g.*, *Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga v. Bellacor.com, Inc.*, No. 2:19-CV-10406-MWF-MRW, 2020 WL 5769080, at *1 (C.D. Cal. July 17, 2020); *Harris*, 2020 WL 3965022, at *1; *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 29), *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023).

[33] Relevant case law also provides that Plaintiff is not required to plead pre-suit investigation related to the specific products they purchased. Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 29) at 5-6, *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) (expressly rejecting argument that investigation must include items purchased by the plaintiff); *Dahlin*, 2020 WL 6647733 at *4 ("Although Plaintiff's counsel's investigation apparently did not track the specific garments Plaintiff purchased, the Complaint nevertheless alleges sufficient facts about a uniform course of conduct to plausibly support a conclusion that the same allegedly fraudulent practices applied to the items Plaintiff purchased."); *Covell v. Nine W. Holdings, Inc.*, No. 3:17-cv-01371-H-JLB, 2018 WL 558976, at *4 (S.D. Cal. Oct. 31, 2017), ECF No. 10, ¶ 13 and Exs. A-L (motion to dismiss denied where item plaintiff purchased—"Stefao" snakeskin print high heels—were *not* included in complaint exhibits supporting pre-suit investigation). Again, **Exhibit B** is a summary of a small sample of products tracked in Plaintiff's counsel's investigation provided to better "give defendant[] notice of the particular misconduct which is alleged to constitute the fraud

32.     Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendants' false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in the possession of Defendants.

## IV.    PARTIES

**<u>Plaintiff</u>**

33.     Sarah Ratra resides in Fremont, California. On April 17, 2024, Plaintiff went shopping at the Polo Factory outlet store located at 447 Great Mall Drive, Milpitas, California 95035 (the "Great Mall Milpitas Outlets"). In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff purchased the following items from the Great Mall Milpitas Outlet on April 17, 2024:

| No. | Item: | False Reference Price: | Purchase Price: |
|---|---|---|---|
| 1 | L/S Fanc<br>SKU 885400309683 | $93.75 | $65.63<br>(30% Off) |
| 2 | L/S Fancy<br>SKU 885400358537 | $93.75 | $65.62<br>(30% Off) |

34.     Plaintiff examined several items at the Polo Factory store in the Great Mall Milpitas Outlets before deciding on what items to purchase. During her time there on April 17, 2024,

---

charged[.]"*Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001); *see also Koller v. Med Foods, Inc.*, No. 14-CV-02400-RS, 2015 WL 13653887, at *4 (N.D. Cal. Jan. 6, 2015) (recognizing that even if the plaintiff was required to perform an investigation, it need not include the actual product the plaintiff purchased). In other words, Plaintiff's identification of similar misrepresentations across different stores indicates the alleged misleading practices are systematic in nature and "it would hardly be a defense" to say that Defendants' reference prices *sometimes* happen to be actual, recent, original prices (they are not). *Id.* at *3. As *Koller* pointed out, even if "some percentage" of Defendants' labeling may be accurate, consumers are "entitled" to representations that are accurate "by design, not by happenstance." *Id.* at *3-4.

Plaintiff noticed numerous signs within the Polo Factory outlet store advertising various "__%

Off" discounts on items throughout the store.[34]

35.    Indeed, after observing the items' "original" prices on their respective price tags

(which are unaccompanied by any qualifying language whatsoever) and the accompanying

discount signage, Plaintiff believed she was receiving a significant discount on the items she had

chosen. Her belief that the discounted prices on the long sleeve shirts she had chosen were for a

limited time and would not last was material and integral to her purchase decision.  She would not

have made the purchase were it not for the significant bargain she thought she was receiving.  On

all products, the advertised discounts were a material representation to her, and she relied on them

in making her purchase decision. Plaintiff's receipt is attached hereto as **Exhibit C**. It shows that

the total "original" price for the two shirts was $187.50, the purported discount/savings was

$56.25,[35] sales tax was $12.30, and Plaintiff paid a total of $143.65.  However, Plaintiff did not

receive the benefit of her bargain.

36.    Plaintiff would not have made her purchases without the misrepresentations made

by Defendants. As a result, Plaintiff has suffered economic injury as a direct result of Defendants'

unlawful, unfair, and fraudulent conduct. Aside from not receiving the benefit of the bargain (i.e.,

the promised value of the merchandise) through her reliance on Defendants' false reference pricing

scheme, Plaintiff was injured because she paid an inflated price (i.e., price premium) for the

merchandise as a result of Defendants' misconduct alleged herein.

---

[34] *See, e.g.*, **Exhibit A**, depicting extent of discount signs on display throughout Defendants' outlet stores.

[35] It is curious that the purported "savings" on the two items differs by one cent given that they were both "discounted" by the same amount from the same reference price.

**Plaintiff's Monetary Injury**

37.    Plaintiff has incurred quantifiable monetary injury as a result of Defendants' fraudulent pricing scheme. Plaintiff overpaid for the dress she purchased, and it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original belief that the item she purchased was discounted and thus that its value was significantly greater than the sale price she paid for it, Plaintiff, in actuality, paid an inflated price for the item.

38.    That is, the item Plaintiff purchased was worth *less* than the amount she paid for it. If Defendants had not employed the falsely advertised "original" price for the item, then that item would not have commanded the higher, inflated price that Plaintiff paid. Accordingly, Plaintiff and Class members paid a *price premium* on Defendants' outlet merchandise as a direct result of Defendants' misconduct.

39.    This price premium arises due to the Defendants' unlawful and deceptive increase of reference prices, which increases consumer demand and prices paid by consumers. The previously discussed academic literature credibly ties increased reference prices to increased consumer demand, and Plaintiff will prove at trial (and through her experts) that Class members paid a price premium in this case. There are several methodologies that courts have accepted in order to tie a false advertising misconduct to Class members' price premium harm (e.g., regression analysis and conjoint analysis), all of which are available here.

40.    For purposes of its investigation and determining a preliminary measure of damages, Plaintiff, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendants' product SKUs sold in stores and its pricing practices attached to each SKU. Plaintiff, through the use of a sophisticated regression analysis, was able to determine the

objective measure by which the Plaintiff, and all Class members similarly situated, overpaid for the goods they purchased.

41.     Plaintiff's experts used the data collected during the investigation to analyze 142 products offered for sale within Defendants' stores during the Class Period. The average selling price within this data sample was $83.25, whereas the average reference price was $127.31. Thus, on average, the reference price chosen by Defendants was $44.06 higher (or 52.9% higher) than the selling price.

42.     Plaintiff's experts used this data to perform initial two regression models which allowed them to preliminarily calculate—based on *publicly available* factors affecting price—the price premium paid by Plaintiff and all similarly situated Class members for each product purchased. The first model provides a simple regression analysis to statistically estimate the relationship between selling price and reference price, and finds a regression coefficient of 0.6646, meaning that an incremental $1 increase in the reference price is correlated with an approximately $0.66 increase in the selling price of the item. The second model adds additional control variables for specific product characteristics (e.g., top vs. dress vs. outerwear, etc.) and finds a regression coefficient of 0.6965. In other words, the data analysis collectively suggests that increasing the reference price by $1 results in an increase of at least approximately $0.66 in the selling price of items at Ralph Lauren Polo Factory stores.

43.     The measured causal relationship between Defendants' reference price and selling price can be converted to an estimated overcharge using the previously described differential between the Defendants' reference price and the selling price. For example, as previously discussed, the preliminary data suggests Ralph Lauren Polo Factory store reference prices were $44.06 higher (or 52.9% higher) than the selling price, on average. When combined with the preliminary regression results described above, this $44.06 differential implies that selling prices

were $29.28 higher, on average, due to the alleged misconduct in this case.[36] This average overcharge of $29.28 represents approximately 35.2% of the average purchase price within the data collected by Plaintiff.[37]

44.     These results will be revised upon receipt of documents and data during discovery but the data suggests that Plaintiff and all others similarly situated paid a price premium as a result of the alleged misconduct.

45.     The table below demonstrates Plaintiff's *quantifiable* resulting damages as measured by each of the above-discussed preliminarily determined regression coefficients. These damages figures are determined by simply multiplying the delta between each item's reference and sale price with the regression coefficient.

| Item | Reference Price | Sale Price | Price Delta | Coefficient | Damages |
|------|-----------------|------------|-------------|-------------|---------|
| L/S Fanc (SKU 885400309683) | $93.75 | $65.63 | $28.12 | .6466 | $18.18 |
|  |  |  |  | .6965 | $19.58 |
| L/S Fancy (SKU 885400358537) | $93.75 | $65.62 | $28.13 | .6466 | $18.19 |
|  |  |  |  | .6965 | $19.59 |

46.     Accordingly, objective measures demonstrate that Plaintiff overpaid for the Polo Factory outlet merchandise she purchased. The difference between the sale price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendants' false reference pricing scheme—and the market sale price that the products would have commanded without Defendants' deception provides an objective measure by which Plaintiff was overcharged and injured by Defendants. The amount of inflation of the prices for the Polo Factory outlet merchandise Plaintiff purchased caused by Defendants' deception thus measures how much Plaintiff overpaid. As shown forth above, this amount can be quantified using regression analysis

---

[36] 0.6646 x $44.06 = $29.28.

[37] $29.28 / $83.25 = 35.2%.

based on Defendants' historic pricing data, which Plaintiff will seek in discovery. Plaintiff's allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 (1999); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2nd Cir. 2015) (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase").

### Plaintiff Does *Not* Have An Adequate Remedy at Law

47.     Plaintiff does not have an adequate remedy at law, and is susceptible to this harm reoccurring because she cannot be certain that Defendants will have corrected its deceptive pricing scheme and, assuming she can determine whether she is purchasing merchandise at a true bargain, she desires to shop at Defendants' Polo Factory outlet stores in the future because she likes the style and brand of the merchandise. Specifically, Polo Factory Outlet stores offer apparel for sale in various different sizes for women; they also offer seasonal apparel items that are only offered during certain times of the year, as well as, on occasion, new merchandise that Defendants have not sold before.

48.     Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Polo Factory outlet stores, Plaintiff will be unable to parse what prices are inflated and untrue, and what prices, if any, are not. Without an injunction enjoining Defendants' false pricing scheme, she cannot trust that Defendants will label and/or advertise their outlet merchandise truthfully and in a non-misleading fashion in compliance with applicable law. Plaintiff simply does not have the resources to ensure that Defendants are complying with California and federal law with respect to their pricing, labeling, and/or advertising of their outlet merchandise. An injunction is the only form of relief which will guarantee Plaintiff and other consumers the appropriate assurances.

49.    Further, because of the wide selection of merchandise available at Defendants' Polo Factory outlet stores, the sheer volume of products involved in Defendants' deceit (i.e., virtually all of them), and the likelihood that Defendants may yet develop and market additional outlet merchandise items for sale in Polo Factory outlet stores, Plaintiff may again, by mistake, purchase a falsely discounted product at one of the Defendants' outlet stores under the reasonable, but false, impression that the advertised reference price represented a *bona fide* former price at which the item was previously offered for sale. However, without substantial, time-consuming, and costly investigation, Plaintiff will have no way of knowing whether Defendants have deceived her again.

50.    Absent an equitable injunction enjoining Defendants from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the general public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendants' ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiff and other consumers the appropriate assurances.

51.    Moreover, Plaintiff lacks an adequate remedy at law with respect to her claim for equitable restitution (as opposed to actual damages) because she has not yet retained an expert to determine whether an award of damages can or will adequately remedy her monetary losses caused by Defendants. Moreover, to the extent Plaintiff has suffered damages as measured by the difference between the price paid and the value represented (i.e., benefit of the bargain damages), California law prohibits her from recovering that measure of damages, but it does not prohibit them from recovering that measure as equitable relief. *See* Cal. Civ. Code § 3343. Particularly, as legal damages focus on remedying the loss to Plaintiff, and equitable restitution focuses wholly

distinctly on restoring monies wrongly acquired by the defendant, legal damages are inadequate to remedy Plaintiff's losses because Plaintiff does not know at this juncture whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.[38]

**Defendants**

52.    Plaintiff is informed and believes, and upon such information and belief alleges, that Defendant Ralph Lauren Corporation is a Delaware corporation with its principal executive offices in New York, New York.

53.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Ralph Lauren Retail, Inc. is a Delaware corporation with its principal executive offices in New York, New York.

54.    Defendants operate Ralph Lauren and related outlet Polo Factory outlet stores as well as the ralphlauren.com website, and advertise, market, distribute, and/or sell clothing and clothing accessories throughout California, New York, Oregon, and the United States.

55.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-20, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is in some manner legally responsible for the damages suffered by Plaintiff and the Class members as alleged herein.  Plaintiff will amend this Complaint to set forth the true

---

[38] Similar allegations have been upheld in other false discount cases where the defendant has challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g.*, *Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021)*; Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10.

names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

56.    Defendants know that their reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California, New York, Oregon, and federal law. Defendants fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about their advertised discount prices and former/reference prices. Defendants concealed from consumers the true nature and quality of the products sold at their Polo Factory outlet stores. Defendants intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Polo Factory outlet products in their stores. At all relevant times, Defendants have been under a duty to Plaintiff and members of the proposed Class to disclose the truth about its false discounts.

## V.    CLASS ALLEGATIONS

57.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants:

> All persons, within the State of California, who, within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Polo Factory outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definitions, including the addition of one or more classes, in

connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

58.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

59.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

      a.    whether, during the Class Period, Defendants used false advertised reference prices on their Polo Factory outlet product labels and falsely advertised price discounts on merchandise sold in their Polo Factory outlet stores;

      b.    whether Defendants ever offered items for sale or sold items at their advertised reference price;

      c.    whether, during the Class Period, the original price advertised by Defendants was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

      d.    whether Defendants' purported sale prices advertised in their Polo Factory outlet stores reflected any actual discounts or savings;

      e.    whether Defendants' purported percentage-off discounts advertised in their Polo Factory outlet stores reflected any actual discounts or savings;

f.      whether Defendants' alleged conduct constitutes violations of the laws asserted;

g.      whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

h.      whether Plaintiff and Class members are entitled to damages and the proper measure of that loss; and

i.      whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparison.

60.     *Typicality*: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

61.     *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to those of the Class.

62.     *Superiority*: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to her and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class

members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

63.     All Class members, including Plaintiff, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, advertising scheme, disseminated in a years-long campaign to New York, California, and Oregon consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendants' false advertising scheme when purchasing merchandise sold at Polo Factory outlet stores.

64.     Plaintiff is informed that Defendants keep extensive computerized records of their Polo Factory outlet customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.     CAUSES OF ACTION

## **FIRST CAUSE OF ACTION**

**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

65.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

66.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

67.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

68.     The UCL imposes strict liability. Plaintiff and members of the proposed Class need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

### *"Unfair" Prong*

69.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

70.     Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendants' acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

71.     The harm emanating from this practice to Plaintiff and members of the proposed Class outweighs any utility it provides because Defendants' practice of advertising false discounts

provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

### *"Fraudulent" Prong*

72.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

73.    Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived Plaintiff and members of the proposed Class and are highly likely to deceive members of the consuming public. Plaintiff and members of the proposed Class relied on Defendants' fraudulent and deceptive representations regarding its false or outdated "original prices" for products sold by Defendants at their Polo Factory outlet stores. These misrepresentations played a substantial role in Plaintiff's and members of the proposed Class's decision to purchase the product at a purportedly steep discount, and Plaintiff and members of the proposed Class would not have purchased the product without Defendants' misrepresentations.

### *"Unlawful" Prong*

74.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

75.    Defendants' act and practices alleged above constitute unlawful business acts or practices as Defendants have violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendants', are described as deceptive practices that would violate the FTCA:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price

is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

76.    As detailed in Plaintiff's Second Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

77.    As detailed herein, and for the same reason that Defendants' acts and practices violate the UCL and FTCA, they also violate the CLRA.

78.    Defendants' practices, as set forth above, misled Plaintiff, the proposed Class, and the public in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

79.    Defendants' violations of the UCL, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff, members of the

proposed Class, and the public, who, if Defendants' false pricing scheme is permitted to continue, will be deceived into purchasing products based on illegal price comparisons. These false comparisons created phantom markdowns and lead to financial harm for consumers like Plaintiff and the members of the proposed Class as described herein. Because of the surreptitious nature of Defendants' deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendants' practice.

80.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff and members of the proposed Class are entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff and the proposed Class of all Defendants' revenues wrongfully obtained from them as a result of Defendants' unfair competition, or such portion of those revenues as the Court may find equitable.[39]

---

[39] California permits broad discretion to fashion remedies as needed, and "the appropriate measure of recovery [under the equitable provisions of California's consumer protection laws] depends on the nature of the case and the alleged harm that [a plaintiff] suffers." *Le v. Kohls Department Stores, Inc.*, 160 F. Supp. 3d 1096, 1104 (E.D. Wis. Feb. 8, 2016). "California's consumer protection laws…authorize multiple forms of restitutionary recovery." *Id.* at 1105; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("[I]n calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information."); *Jacobo v. Ross Stores, Inc.*, No. CV-15-04701-MWF-AGR, 2016 WL 3482041, at *7 (C.D. Cal. Feb. 23, 2016) ("Remedy for the alleged misconduct is not limited to the difference between the value of the goods [p]laintiffs purchased and the price for those goods*."); Russell v. Kohl's Dep't Stores, Inc.*, No. ED CV 15-1143 RGK (SPx), 2015 WL 12781206, at *3-4 (C.D. Cal. Oct. 6, 2015) (explaining why cost minus value is not the exclusive method of measuring restitution); *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO (RNBx), 2015 WL 1526559, at *4 (C.D. Cal. Mar. 23, 2015) ("[A]lthough California case law makes clear that [cost minus value] can be a measure of restitution, defendant has not cited, nor has the court found, any authority indicating that is the only way restitution can be calculated."); *Johns v. Bayer Corp.*, No. 09-cv-1935-AJB (DHB), 2012 WL 1520030, at *5 (S.D. Cal. Apr. 30, 2012) (finding that neither In re Vioxx nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution"); *Stathakos,* 2016 WL 1730001, at *4 (challenge to restitution methodology premature at motion to dismiss stage); *In re*

## SECOND CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, *et seq.***

81.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

82.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the CLRA, Cal. Civ. Code § 1750, *et seq*.

83.    Plaintiff and each member of the proposed Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendants' sale of products at their Polo Factory outlet stores were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff and members of the proposed Class are "goods" or "services" within the meaning of Cal. Civ. Code §§ 1761(a) - (b).

84.    Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and members of the proposed Class which were intended to result in, and did result in, the sale of products sold at their Polo Factory outlet stores:

a.    advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

b.    making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

85.    Plaintiff is a consumer who has suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendants' use and employment of the false and

---

*Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015) (explaining that *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) did not limit measuring restitution to the price/value differential).

misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff therefore seeks an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper. Plaintiff additionally seeks costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

86.     On June 25, 2024, Plaintiff, through counsel, sent a CLRA demand letter to Defendants that provided notice of Defendants' violation of the CLRA and demanded Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, Plaintiff would file a complaint seeking damages in accordance with the CLRA. If Defendants do not respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782, Plaintiff will amend the complaint to seek actual, punitive, and statutory damages, as appropriate against Defendants.

87.     Filed concurrently herewith is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendants as follows:

1.     an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

2.     awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

3.      awarding declaratory and injunctive relief as permitted by law or equity, including: preliminarily and permanently enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

4.      retaining jurisdiction to monitor Defendants' compliance with permanent injunctive relief;

5.      awarding actual, punitive and/or statutory damages, as appropriate and according to proof;

6.      ordering Defendants to engage in a corrective advertising campaign;

7.      awarding attorneys' fees and costs; and

8.      for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all of the claims so triable.

Dated: June 25, 2024

**LYNCH CARPENTER LLP**

By:  _/s/ Gary F. Lynch_
Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    412.322.9243

**LYNCH CARPENTER LLP**
Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Scott G. Braden (*pro hac vice* forthcoming)
scott@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:    619.762.1910
Facsimile:     858.313.1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*