## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IDA MOLAYEM, MICHAEL GATHEN, and KEITH WHITE, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>RALPH LAUREN CORPORATION, a Delaware corporation, RALPH LAUREN RETAIL, INC., a Delaware corporation, and DOES 1-50, inclusive,<br><br>        Defendants. | Case No. 1:24-cv-04816 (JGLC)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiffs Ida Molayem, Michael Gathen, and Keith White (collectively, "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against Defendants Ralph Lauren Corporation and Ralph Lauren Retail, Inc. (collectively, "Defendants"), and state:

## I.    NATURE OF ACTION

1.    "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Ralph Lauren's Polo Factory Store outlet ("Polo Factory") fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.     Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendants lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.     At all relevant times, Defendants have continually advertised false price discounts for merchandise sold throughout their Polo Factory outlet stores.[2] In bringing this putative class action complaint, Plaintiffs seek to remedy this deception and its attendant harm to consumers. Plaintiffs seek monetary damages, restitution, and declaratory and injunctive relief from

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

[2] In the early 1970s, Ralph Lauren began as a high-end luxury fashion and apparel store, opening its first freestanding retail store on Rodeo Drive in Beverly Hills, California. Over the years, Ralph Lauren evolved and became known for the marketing and distribution of premium lifestyle products in four categories: apparel, home, accessories, and fragrances. Within its clothing apparel segment, Ralph Lauren offers a variety of brands including Polo Ralph Lauren, Ralph Lauren Purple Label, Ralph Lauren Collection, Lauren Ralph Lauren, Double RL, Ralph Lauren Childrenswear, Denim & Supply Ralph Lauren, and Chaps. Ralph Lauren sells its luxury and upscale brands almost exclusively at its Ralph Lauren, RRL, and Polo Ralph Lauren retail stores.

In an effort to increase their market share, Defendants position their Polo Ralph Lauren brand as an affordable alternative to their luxury brand products. The Polo Ralph Lauren brand mimics the designs of Defendants' more prestigious luxury brands but, as discussed at length below, based on the investigation of counsel and information and belief, offers lesser-quality products at significantly lower price points to consumers. Ralph Lauren's luxury brands are sold exclusively at their high-end stores, Ralph Lauren, RRL, and Denim & Supply. In contrast, with very limited exceptions, Defendants sell the Polo Ralph Lauren brand clothing exclusively at their Polo Factory Stores located in outlet malls.

Defendants arising from their false discounting scheme on women's apparel, accessories, shoes, and other items sold in their Polo Factory outlet stores.

4.     False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[3] Consequently, false reference pricing schemes enable retailers, like Defendants, to sell products above their true market price and value, leaving consumers to pay the inflated price, regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.     The following example of a hypothetical DVD seller, which parallels Defendants' practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

---

[3] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

6.     The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false reference pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable, but incorrect, **perceived value** of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD. Thus, the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continue to violate, California and federal law. Specifically, Defendants violated and continue to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (the "CLRA"); New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.* (the "NYDAPA"); New York's False Advertising Act, N.Y. Gen. Bus. Law § 350, *et seq.* (the "NYFAA"); Oregon's Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.605, *et seq.*; and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.     Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who have purchased one or more of Defendants' outlet items advertised a purported discount from a fictitious higher reference price from Defendants' Polo Factory outlet stores. Plaintiffs intend to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of

consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiffs also seek to permanently enjoin Defendants from engaging in this unlawful conduct. Further, Plaintiffs seek to obtain all applicable damages, including actual, benefit of the bargain, statutory and punitive damages, restitution, reasonable costs and attorneys' fees, and other appropriate relief in the amount by which Defendants were unjustly enriched as a result of their sales of merchandise offered at a false discount.

## II.     JURISDICTION AND VENUE

9.      This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Classes (defined below), have a different state citizenship from Defendants.

10.     The Southern District of New York has personal jurisdiction over Defendants because both Defendants Ralph Lauren Corporation and Ralph Lauren Retail, Inc. are Delaware corporations or other business entities which do conduct business in the State of New York and have principal executive offices located in New York, New York. Defendants conduct sufficient business with sufficient minimum contacts in New York, and/or otherwise intentionally avail themselves to the New York market through the operation of Polo Factory outlet stores within the State of New York.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District.

## III.     GENERAL ALLEGATIONS

## A.     Retailers Benefit from False Reference Pricing Schemes.

12.     Defendants engage in a false and misleading reference price scheme in the marketing and selling of their Polo Factory merchandise at their Polo Factory outlet stores.

13.     Retailers like Defendants can benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin et al., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[4] Most often, as with retail clothing, consumers lack full information about products and, as a result, often use information from sellers to make purchase decisions.[5]

14.     Defendants' deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[6] In other words, consumers view Defendants' deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[7] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more

---

[4] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. LAW & ECON. 67, 68-69 (1973).

[5] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78, no. 2 J. POL. ECON. 311, 311-12 (1970).

[6] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4, no. 3 MKTG. SCI. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting and Consumer Choice*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[7] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 52.

satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[8] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[9]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[10] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[11] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[12] For infrequently purchased products, external reference prices can be particularly

---

[8] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no 3 J. OF CONSUMER PSYCH. 328 (2003).

[9] "To incorporate . . . the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting and Consumer Choice*, *supra* n.6, at 205.

[10] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, 19 no. 1 J. OF CONSUMER RSCH. 62, 68 (1992) [hereinafter Mayhew & Winer, *An Empirical Analysis*].

[11] Mayhew & Winer, *An Empirical Analysis*, *supra* n. 10, at 62.

[12] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* 62 J. OF MKTG. 46, 48 (1998) [hereinafter Grewal et al., *The Effects of Price-Comparison Advertising*].

influential because these consumers have little or no prior internal reference.[13] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[14] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[15] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][16]

16.    In Staelin, *Regulation of Fictitious Pricing*, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and

---

[13] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[14] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*, 18 no.1 J. PUB. POL'Y & MKTG. 3, 7 (1999) [hereinafter Grewal & Compeau, *Pricing and public policy*].

[15] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14, no. 3 MKTG. SCI. G161 (1995); *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. OF APPLIED BUS. RSCH. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[16] Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

confirms many of the same older consumer studies cited above[17] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.    Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[18] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 12 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendants, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendants' advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendants' product because, as Staelin et al. put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***." *Id.* at 835 (emphasis added).

## B.    Defendants Engage in a Fraudulent Price Discounting Scheme

19.    For years, Defendants have engaged in a fake discounting scheme that harms consumers by advertising their Polo Factory outlet merchandise at discounted "sale" prices in their Polo Factory outlet stores. In short, Defendants market the "sale" prices as discounts from the

---

[17] *See* Staelin et al.*, supra*, at 826 ("***It is now well accepted*** that many consumers get extra utility, beyond that associated with consuming a product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

[18] Staelin et al., *supra*, at 826 (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

original or "ticket" prices listed on the products' price tags for Polo Factory merchandise sold at the Polo Factory outlets. In most cases, the items are each accompanied by a placard sign immediately above or below them[19] advertising a "__% Off" of the original, ticketed reference price. In other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price tag price. The discount placard signs are printed on white card stock with bold, black lettering advertising the fake discount.

20.     The photos below demonstrate Polo Factory's uniform storewide practice in place at all Polo Factory outlets:[20]

 

---

[19] In other cases, such as with table displays, the discount sign applies to several, typically similar, items.

[20] *See also* **Ex. A**, additional Polo Factory in-store photographs depicting the extent and pervasiveness of Defendants' pricing scheme.

21.     As can be seen in the above photos and in **Ex. A**, Defendants' "original" or "ticket" prices are unadorned by any qualifying language that could arguably direct consumers to compare their reference/sales prices to any other market outside of Defendants' own stores.[21] This reasonable impression is reinforced by Defendants' pervasive use of "__% OFF" advertisements, which denote limited-time discounts from *former* prices.[22] Further, as discussed below, Defendants often apply multiple levels of discounts on Polo Factory Store merchandise. Thus, Defendants do not advertise any "discounts" from any other stores Polo Factory merchandise. Additionally, Plaintiffs are informed and believe and thereon allege that much of the merchandise sold at Polo Factory outlets is manufactured exclusively for the Polo Factory outlets.[23] Likewise, in the case of any out-of-season mainline merchandise offered at the Polo Factory outlet stores, the reference prices accompanying those items are *not*: (1) actual, bona fide former prices; (2) recent, regularly offered former prices; or (3) prices at which identical products are regularly sold, or have been recently sold, elsewhere in the market. This is because the items are old and outdated.[24]

---

[21] Whether reasonable consumers understood the reference price to mean the mainline price and not a former price at the Polo Factory Store outlet is an ultimate factual question requiring expert opinion on matters of consumer perception and not something Plaintiffs (or their counsel) can decide, much less "admit" to.

[22] *See Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

[23] *See, e.g.,* Ralph Lauren Corporation, Annual Report (Form 10-K), at p. 9 (May 23, 2024) ("2024 10-K") ("Our Ralph Lauren stores feature a broad range of apparel, footwear & accessories, watch and jewelry, fragrance, and home product assortments in an atmosphere reflecting the distinctive attitude and image of the Ralph Lauren, Polo, and Double RL brands, including ***exclusive merchandise*** that is not sold in department stores.") (emphasis added).

[24] *See* 2024 10-K at p. 10 (outlet stores "serve as a secondary distribution channel for our excess and out-of-season products.").

22.     Moreover, Defendants do not make "Compare At" pricing representations. In those schemes, an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Accordingly, Plaintiffs are *not* required to "'assert evidence from which a rational trier of fact could infer that the comparative reference price was inaccurate[,]'" *Harris v. PFI W. Stores, Inc.*, No. SACV192521JVSADSX, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling*, 291 F. Supp. 3d at 1085-86), because, "th[at] situation ***only arises when the language of the advertisement <u>implies a comparison to another retailer</u>***." *Id.* (citing *Horosny v. Burlington Coat Factory of California, LLC*, No. CV1505005SJOMRWX, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added). Both Defendants' exclusive and non-exclusive outlet items bear ticket prices unaccompanied by any qualifying language that would reasonably indicate a comparison to another market, and so consumers are not put on notice to seek out those comparisons. Thus, it is irrelevant to Defendants' liability whether the outlet items are sold in other markets, like department stores.

23.     Nor do Defendants disclose any date on which the "original" prices last prevailed in the market. The omission of these material disclosures, coupled with Defendants' use of fake reference and sale prices, renders Defendants' pricing scheme inherently misleading to reasonable consumers, like Plaintiffs,[25] who have no way meaningful way of discerning that Defendants'

---

[25] Claims brought pursuant to the UCL and CLRA are "governed by the 'reasonable consumer' test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "Where, as here, the reasonable consumer test applies to plaintiff's underlying [false discount pricing] claims, it is a 'rare situation in which granting a motion to dismiss is appropriate.'" *Rubenstein*, 687 F.App'x. at 566 (citing *Williams*, 552 F.3d at 939). Numerous courts analyzing allegations of false discount pricing have likewise held that the "reasonable consumer" challenges are inappropriate on the pleadings. *See, e.g.*, *Inga v. Bellacor.com, Inc.*, No. 219CV10406MWFMRW, 2020 WL 5769080, at *3 (C.D. Cal. July 17, 2020) (citing *Williams*, 552 F.3d at 939); *Chester v. TJX Companies, Inc.*, No. 515CV01437ODWDTB, 2016 WL 4414768, at *10 (C.D. Cal. Aug. 18, 2016); *Horosny*, 2015 WL 12532178, at *4.

pricing representations are deceptive without substantial, time-consuming, and costly investigation before *every* purchase. Consequently, the discounts advertised throughout Polo Factory stores are fake and used fraudulently to induce consumers to make purchases and spend more under the reasonable, but incorrect, belief that the discounts are genuine.

24.     Even if Defendants did sometimes offer the outlet products at their full reference price (which they do not), that offering would do little to legitimize Defendants' practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public *on a regular basis for a reasonably substantial period of time*." 16 C.F.R. § 233.1(a) (emphasis added). [26]   Rather, the advertised reference prices on Polo Factory merchandise are *not* the price at which Defendants regularly (or ever) sell, or expect to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

25.     Limiting § 233.1 and UCL liability to an advertiser's own former prices makes sense, too, because when consumers view strikethrough reference prices, such as Defendants', they are left with the impression that the reference price was a former price of the item at that

---

[26] Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendants also fail to do on *all* advertisements. *See generally*, *people v. Super. Ct. (J.C. Penney Corp., Inc.)*, 34 Cal. App. 5th 376, 410-13 (2019) (where certain items are sold by only one retailer, the "prevailing market price" is the most "common," "predominant," or "most widely occurring" price at which items are sold by that retailer) (citing authorities). Of the UCL, CLRA, and FAL, only the FAL requires any investigation of outside market (to determine what constitutes the "prevailing" market price). Liability under all three prongs of the UCL and the CLRA can rest on the theory that a retailer's unqualified price tag reference price are false as former prices at that location. *See Harris*, 2020 WL 3965022, at * 4 ("Since Harris does not allege PFI made comparisons to other retailers in its advertisements, there is no need to distinguish between the exclusive and non-exclusive products.") (emphasis added).

particular store. *See Hinojos*, 718 F.3d at 1106; *Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting Knapp, 2016 WL 3268995, at *4); Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising*, 11 J. of Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); *id*. at 56 ("[E]mpirical studies indicate that as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases.").

26.    In sum, Defendants' fake discount scheme is intended to increase sales while depriving consumers of the benefit of their bargain.[27] Indeed, this conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information.

## C.    Defendants' Fraudulent Price Discounting Scheme Harms All Consumers

27.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[28] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[29] Consumers are misled and incorrectly overvalue Defendants' Polo Factory

---

[27] Staelin et al., *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

[28] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[29] Gotlieb & Fitzgerald, *An Investigation*, *supra* n.15, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay

outlet stores' products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendants to command inflated prices beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[30]

28.    Accordingly, all consumers who purchase Polo Factory merchandise are harmed by Defendants' pricing scheme because its impact pervades the entire market for Polo Factory outlet merchandise. This is because, again, the artificially increased demand generated by Defendants' pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *supra*, at 835. Thus, all Polo Factory outlet shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendants' Polo Factory merchandise. All consumers who purchase falsely discounted Polo Factory outlet products have

---

for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

[30] Dhruv Grewal et al., *The Effects of Price-Comparison Advertising*, *supra* n.12, at 46.

overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

29.     To put it differently, the fake discount information presented by Defendants' falsely advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[31] on their Polo Factory outlet purchases, which they would not have otherwise gained but for Defendants' fake discounting scheme. Consumers' valuation of Polo Factory outlet merchandise therefore increases in the aggregate.

30.     Fundamental economics concepts and principles dictate that the harm caused by Defendants' scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived Polo Factory outlet shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[32] The aggregate demand curve for a product, including Defendants', represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness

---

[31] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'"); Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[32] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition. New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

31.    As a result, Defendants' pricing scheme impacts the market prices of their Polo Factory outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Polo Factory outlet prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiffs and members of the proposed Classes (defined below) thus suffered a common impact from Defendants' misconduct.

**D.    Investigation**

32.    Plaintiffs' counsel has been investigating Polo Factory outlet stores since February 2022. Since then, Plaintiffs' counsel has monitored Defendants' Polo Factory outlet store prices in California, New York, and Oregon. More specifically, Plaintiffs' counsel formally began monitoring California Polo Factory Stores on February 7, 2022. Plaintiffs' counsel conducted frequent visits to Defendants' California Polo Factory Stores to observe and track its pricing practices until May 11, 2022. Plaintiffs' counsel formally re-commenced the investigation in April 2024, conducting additional frequent visits to California Polo Factory Stores, including visiting 100 Citadel Drive, Suite 509, Los Angeles, CA 90040 (the "Citadel Outlets"), where Plaintiff Molayem made her relevant purchase. This investigation is ongoing and the latest photos were taken from  September 24-26, 2024, at the Factory Outlet stores located at 5600 Paseo Del Norte, Suite 100, Carlsbad, CA 92008 and the Citadel Outlets.

33.    Plaintiffs' counsel first observed in-store pricing at Polo Factory Store in Oregon on September 6, 2023. It was immediately determined that the pricing scheme (i.e., the use of

ticketed reference prices and purported discount signage throughout the store advertising price reductions on virtually everything) was uniform and identical to what was observed in California stores. Plaintiffs' counsel formally commenced an investigation in March 2024 and the first set of photos were taken March 13, 2024, at the Woodburn Outlets mall, located at 1001 Arney Road, #200, Woodburn, Oregon 97071 (the "Woodburn Outlet"), where Plaintiff White made his relevant purchases, which was continually monitored. That investigation is also ongoing with the last set of photos taken September 3, 2024. During this time, Plaintiffs' counsel also monitored pricing in New York. The pricing scheme there (i.e., use of reference prices and omnipresent discount signage) was uniform and identical to what was observed in California and Oregon stores.[33] The only thing that changed periodically was the purported percent-off (__% Off) discount (or whole-price reduction, e.g., "Now $__") on certain merchandise, though the items were never observed for sale at the "original" price—that is, without some type of discount. **Ex. B** to this amended complaint provides numerous exemplar products from the investigation that were observed to remain on sale during the given time frame.[34]

---

[33] That is, the fake discounting scheme described above in Section III.B. was uniformly implemented at each location. *See* **Ex. A**.

[34] Contrary to what Defendants will most likely present, many more false discount pricing cases brought in California federal district courts have held that—notwithstanding Rule 9(b)— a false discounting plaintiff is ***not*** required to perform or provide ***any*** specific details pertaining to pre-lawsuit investigations into false discounting practices in order to defeat a motion to dismiss. *See, e.g.*, *Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (complaint lacking in any allegations related to pre-suit investigation of false discounting practice satisfied Rule 9(b); *Knapp*, 2016 WL 3268995, at *4 (allegations of "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying motion to dismiss where plaintiff pled existence of deceptive pricing scheme "on information and belief" only, without

34.    The investigation confirmed that the items Plaintiffs bought, as set forth below, were subject to the same pervasive, uniform, and systematic practice employed at Defendants' Polo Factory Stores of using false reference prices and purported discounts. The investigation demonstrated thousands of items remain continuously discounted on a daily basis throughout the investigation period, ***including those products purchased by Plaintiffs***.[35] Indeed, the investigation strongly suggests that Polo Factory merchandise is *never* offered for sale at a full "original" price— and certainly not "on a regular basis for a reasonably substantial period of time," as required by the FCTA. *See* 16 C.F.R. § 233.1 ("[T]he former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time").

---

investigation); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Still, complaints containing pre-suit investigation allegations similar to Plaintiff's here have routinely been sustained over motion to dismiss challenges, in California federal courts as well as state courts which notably *do not* apply Federal Rule 9(b)'s heightened pleading standard for actions sounding in fraud. *See, e.g.*, *Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris v. PFI W. Stores, Inc.*, No. SACV 19-2521 JVS (ADSx), 2020 WL 3965022, at *1 (C.D. Cal. Apr. 9, 2020); *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint); *Schertzer v. Alpargatas USA Inc* (Super. Ct. San Diego, 37-2019- 00015352, Dkt. No 45).

[35] Defendants (rightfully) admit that Plaintiff's counsel "need not have necessarily investigated the precise items purchases by Plaintiff[s]" so long as Plaintiffs "allege that the products [they] purchased were subject to the same 'overall scheme' that [] counsel claims to have uncovered, even if 'on information and belief.'" ECF No. 24 at n.2. In case the language above is not clear, Plaintiffs each allege, on information and belief, based on their experiences and the investigation performed by counsel, that the products described elsewhere in this amended complaint were subject to the same overall scheme described in this complaint.

35.    Since Defendants filed their Motion to Dismiss on September 18, 2024 (ECF Nos. 23-24), Plaintiffs' counsel has systematically searched for the items Plaintiffs purchased at Defendants' Polo Factory Stores at its physical mainline Ralph Lauren retail stores and website.[36] Of the sixteen (16) products purchased by Plaintiffs set forth in ¶¶ 57, 61, 65 of this amended complaint, none could be located at the mainline store. *See* **Ex. C** (Ralph Lauren mainline in-store photographs).

36.    Plaintiffs' counsel also went to a local mainline store and tried to find anything similar to outlet styles to further compare. The mainline Ralph Lauren stores are generally filled with real leather jackets, cashmere sweaters, and more expensive quality and trendier styles overall than the Polo Factory Store outlets.

37.    Further, the Polo Factory Store outlet styles put a greater emphasis on promoting the Defendants' logo and name than the mainline stores.[37] The Polo Factory Store outlets also carry mostly the same styles all year round, while the only items carried in the mainline store that are a close comparison are the custom slim fit and classic fit polo shirts. Plaintiffs' counsel also found similar shorts in the Polo Factory Store outlet and mainline stores but those were not exactly the same; as well as a similar striped, pink shirt, but there the Defendants' logo was in different locations.

---

[36] Interestingly, in the County of San Diego, for instance, there are three Polo Factory Store (outlet) locations and only one mainline Ralph Lauren location. As part of this investigation, the Plaintiffs' counsel observed merchandise and prices in the mainline Ralph Lauren store located at 7830 Girard Avenue, La Jolla, CA 92037. *See* **Ex. C** (Ralph Lauren mainline in-store photographs). The next closest mainline store is in Costa Mesa, approximately 80 miles away. Plaintiffs' counsel visited there on September 27, 2024. That store appeared to match the makeup of the La Jolla store. Comparing **Ex. C** to **Ex. A** (mainline vs. outlet in-store photos), it is clear that the mainline products are different in style and appearance. Based on this, and other reasons discussed in this Section, Plaintiffs are informed and believe and thereon allege that the Ralph Lauren mainline merchandise is superior in quality, materials (e.g., fabric), and workmanship, as compared to the merchandise sold at Polo Factory Store outlets.
[37] For example, many of the mainline shirts do not have the logo or, on other shirts, it is somewhat hidden.

38.     Recent visits to Defendants' Ralph Lauren mainline stores, Macy's, and Polo Factory Store outlets were conducted on September 24th-27th.

39.     With respect to the Plaintiffs' purchases discussed *infra* below, **only 1 of the 16 total items** could be located in the mainline Ralph Lauren e-commerce store, ralphlauren.com (the "Mainline Website").[38] Before getting further into the details of these search results, it is worth noting that all (or virtually all) of the items sold at Polo Factory Stores are marked on the back tag with a QR code.[39] Plaintiffs are informed and believe and thereon allege that the QR codes are used by Defendants primarily to help authenticate legitimate Ralph Lauren and Polo Factory Store merchandise and protect against counterfeits. When an item's QR code is scanned with a smartphone, the user is directed to a webpage with certain product-specific details (the "Authentication Page"). *See, e.g.*, **Ex. D** at 1. Ralph Lauren/Polo items sold at Macy's[40] present the same Authentication Page.

40.     The Authentication Page provides consumers with three pieces of information about the product: (1) a supplier number, (2) a material number, and (3) the date of manufacture. *See id.* In addition to the Mainline Website, ralphlauren.com, Defendants have a website for Polo Factory Store merchandise, poloralphlaurenfactorystore.com (the "Outlet Website"). However, unlike the Mainline Website, which is an actual e-commerce sales channel, consumers cannot make purchases on the Outlet Website. Instead, as discussed below, it provides limited

---

[38] To conduct this search, Plaintiffs' counsel used the Mainline Website's search feature to enter the product name for each product Plaintiffs purchased. The product names were sourced from either Plaintiffs receipts or the products respective Authentication Page. When conducting this search Plaintiffs' counsel realized the product names on Plaintiffs' receipts were abbreviated, truncated, and generalized. Thus, there may be additional products on Defendants' Mainline Website, but without the ability to search by SKU Plaintiffs' counsel (or any consumer) are unable to make this determination.

[39] *See* Ralph Lauren Corporation, *Ralph Lauren Corporation Unveils Digital Product Identities to Tens of Millions of Products* https://corporate.ralphlauren.com/pr_191101_DigitalProductID.html (last accessed Sept. 27, 2024).

[40] Which Plaintiffs' counsel visited recently on September 25th and 26th at multiple locations.

information, including the color, size, and style number of the item (e.g., Style # 3538-10001-0105-041). Above all, though, in most cases, the Outlet Website product pages display the same "original" reference price that is located on the Polo Factory Store in-store merchandise price tags.

41.     As an initial matter, none of the information provided about an item by its Authentication Page (reached via QR code) is shown (or can be navigated to) on *either* the Outlet Website or the Mainline Website. Thus, it is useless in attempting to track down or cross-reference an item there. The most efficient way to do that, in Plaintiffs' counsel's experience, is to search the Mainline Website using the item's name. The Outlet Website does not have a product search function, making much of the exercise performed by Plaintiffs' counsel described in this Section a painstakingly slow process.[41]

42.     Plaintiffs Molayem and White provided Plaintiffs' counsel with QR codes for some of the items they purchased. Plaintiff Molayem provided two and Plaintiff White provided four. Plaintiffs' counsel scanned those QR codes, reviewed the Authentication Pages they linked to, and attempted to locate the items on both the Outlet Website and the Mainline Website. *See* **Ex. D**. When Plaintiffs' counsel searched for these six items on the Mainline Website, only one was found. In fact, of all the Plaintiffs' items described in this complaint (16), this was the only one that could be located on the Mainline Website. *See* **Ex. D** (Custom Slim Fit Mesh Polo Shirt).[42]

43.     Plaintiffs' counsel used this approach to investigate the Mainline Website links formerly provided by Defendants' counsel who reported that they alone *proved* that former plaintiff Ratra's two items were also sold on the Mainline Website at full price. That process

---

[41] In short, Plaintiffs' counsel scrolled through the outlet items individually and searched those product names and style numbers on the Mainline Website in an effort to find a matching product names and/or images.

[42] Plaintiffs' counsel performed dozens of additional searches of Polo Factory Store outlet items, including of former plaintiff Ratra's items (discussed below), and either could not find them on the Mainline Website, or if an item bearing that name could be found, it had a different Style Number.

brought to light other problems with Defendants' representation that all Polo Factory Store merchandise is also available at full price through the mainline channels.[43]

44.     First, based on Plaintiffs' counsel's research, Plaintiffs are informed and believe and thereon allege that Defendants intentionally obfuscate consumers' ability to cross-reference merchandise using the data contained on any given item's (1) Authentication Page, (2) in-store receipt, (3) Mainline Website product page, and (4) Outlet Website product page. This is because none of these platforms share *any* of the same product identification information. The table below illustrates what data is contained on what platform:

| Platform | Product Data Provided |
|---|---|
| Authentication Page | • Supplier number<br>• Material number<br>• Date of Manufacture |
| In-store receipt | • SKU (Stock Keeping Unit) |
| Mainline Website product page | • Materials<br>• Product Dimensions<br>• Wash Instructions (e.g., hand wash)<br>• Imported or Domestic Status<br>• Style Number |
| Outlet Website product page | • Color<br>• Size<br>• Style number |

45.     As the above table shows, the *only* datapoint appearing on multiple platforms is the Style Number, which appears on both the Mainline Website and Outlet Website product pages. *See, e.g.*, **Ex. E**, pp. 3-6 (comparing Mainline Website and Outlet Website product pages). If the Polo Factory Store items were also available on the Mainline Website, as Defendants claim they are, one would expect these Style Numbers would be the same on both the websites. Why would a clothing retailer go through the trouble and expense of assigning different style numbers for the *same* item just because it is sold through outlet and mainline sales channels, unless the items

---

[43] Plaintiffs' allegations herein notwithstanding, at the very least, this is a factual disputes not appropriately decided on the pleadings.

somehow differed in their manufacturing processes, materials, or in some other meaningful way, such that the retailer would want to separately track them in its sales and inventory management system or otherwise keep them separate to assist communications with manufacturing partners.[44]

46.     Having said that, when Plaintiffs' counsel attempted to cross-reference items between the Mainline Website and the Outlet Website, including each of the items purchased by Plaintiffs and former plaintiff Ratra, it was revealed that, in all cases, *the Style Numbers were different*.[45] For instance, with respect to former plaintiff Ratra's items, Plaintiffs' counsel took the Mainline Website links provided by Defendants' counsel and compared them to what appeared to be the same item on the Outlet Website. *See* **Ex. F.**  The Style Numbers were different. *See id.*

47.     Another example: There is a product called the Polo Bear Cotton scarf that can be located on the Mainline and Outlet Websites. *See* **Ex. E**, p. 6. The items bear the same name and product page image. However, in addition to having different Style Numbers, the Mainline Website-version of the Polo Bear Scarf is listed as "100% cotton," while the outlet product page is *silent* on the materials.

48.     Without a unique identification number across all (or any) platforms, Plaintiffs' counsel and consumers generally cannot verify whether an item bearing the same name and/or

---

[44] See *What is a Style Number in Fashion?*, Kiwi Sizing, https://kiwisizing.com/blog/what-is-a-style-number-in-fashion/#:~:text=What%20Is%20the%20Purpose%20of,for%20tracking%20sales%20and%20returns (lasted accessed Sept. 27, 2024) ("Clothing makers assign each style a number to make it easier for the manufacturer, sewers, pattern makers, and other supply chain members to track items.").

[45] *See, e.g.,* **Exs. D** (search results for Plaintiffs' Molayem and White items), **E** (search results of other products), and **G** (search results for former plaintiff Ratra's products).

appearance[46] on the Mainline and Outlet Websites (or at third party retailers, e.g., Macy's)[47] are in fact identical. Plaintiffs are therefore informed and believe and thereon allege that they are not.

49.     Indeed, **Ex. E** depicts the results of Plaintiffs' counsel's effort to search for several products randomly selected from the Outlet Website on the Mainline Website.  As shown there, the Mainline Website showed no results for some of the items when searched by name; and even for the product names that hit on the Mainline Website, again, the Style Numbers are different. *See Id*. On the others that could be (ostensibly) found on the Mainline Website, despite the item names appearing the same, all of the item images and style numbers were different. Indeed, even the formatting of the style numbers remained distinct between mainline and outlet products, with mainline style numbers consisting of 6-9 digit numbers and outlet style numbers as sixteen digit numbers consistently hyphenated in the following format (####-#####-####-###). Additionally, the Mainline Website product pages for each item that could be "located" there were *all* discounted. *See id.*

50.     Additionally, a comparison of the price tags on in-store merchandise as between the mainline store and the outlet stores further suggests that the mainline and outlet products are separate and exclusive product lines. The outlet price tags have a blue banner on the top border with "Ralph Lauren" printed in white text and the reference price is unaccompanied by any language (e.g., "Compare at", "Comparable Value", "MSRP", etc.). *See, e.g.,* **Ex. A** at 2. In contrast, the mainline price tags do not have the blue/white "Ralph Lauren" descriptor on the top border. The prices on the mainline price tags also say "MSRP". *See, e.g.*, **Ex. C at 8**. The price

---

[46] Even as between items with the same name on their Outlet Website product page and Mainline Website product page, the item images oftentimes appear different. *See, e.g.*, **Ex. E** (see "High Rise Relaxed Straight Jean" and "High-Rise Flare Jean").

[47] Macy's website sells Ralph Lauren/Polo products but does not present a style number, instead there is an unhyphenated "Web ID" that ranges in digits. See, e.g., https://www.macys.com/shop/product/polo-ralph-lauren-big-boys-cotton-fleece-zip-up-hoodie?ID=1931021&isDlp=true&swatchColor=Red.

tags on Defendants' merchandise at Macy's also match the mainline store price tags, further suggesting that the Polo Factory Store outlet merchandise is not the same as in Defendants' mainline stores or Macy's. *See* **Ex. G** (comparison of mainline and Macy's price tags). Plaintiffs intend to seek answers and clarification on these matters in discovery.[48]

51.    Together, this leads Plaintiffs to the inescapable conclusion that many of the items available in Polo Factory Store outlets, ***including those purchased by Plaintiffs***, are manufactured for outlet and sold there exclusively. Accordingly, Plaintiffs are informed and believe and thereon allege that, despite certain products having the ostensibly the same appearance and/or name as between the Mainline sales channels (physical stores and Mainline Website) and the outlet channels (i.e., physical store only), they are ***not*** 100% identical and differ in materials and/or manufacturing process and/or in other meaningful respects.

52.    Plaintiffs are further informed and believe and thereon allege that the items they purchased, as well as the majority of items offered in Polo Factory Store outlets, are made from materials and/or manufacturing processes that are ***exclusive*** to the Polo Factory Store outlets. Conversely, Plaintiffs are informed and believe and thereon allege that Ralph Lauren "mainline" items are superior in quality in terms of their fabric and/or other materials and/or manufacturing processes used (i.e., workmanship).

53.    However, Plaintiffs may need an industry expert and survey of Defendants' internal documents to determine the full extent of differences between Defendants' mainline and Polo Factory Store outlet merchandise, including the items Plaintiffs purchased, as well as the

---

[48] Before Defendants filed their Motion but after they sent the website links purporting to prove that former plaintiff Ratra's items were sold (as was all Polo Factory Store merchandise, they claimed) in the mainline channels, Plaintiffs' counsel invited Defendants to produce *any* internal document(s) or declaration(s) supporting this assertion. Defendants refused. Notwithstanding the difference in Style Numbers, without further *factual* evidentiary support, there is no way to determine whether the items' mainline and outlet versions are made of the same quality materials and/or manufacturing processes.

composition of Polo Factory Store inventory in terms of how much of it is made for outlet as opposed to items that are actually also available in the Mainline channels.

54.     As it stands, without the benefit of discovery, Defendants have exclusive possession of the Authentication Page software and data, inventory, pricing, and sales data from their Outlet and Mainline Websites, as well as from the brick-and-mortar Polo Factory Store outlets and Ralph Lauren Mainline retail stores. Plaintiffs are informed and believe that Defendants have internal documents and witnesses that can shed a great deal of more light on these differences. Thus, despite Plaintiffs' counsel's best efforts at investigation, the full extent of Defendants' false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in the possession of Defendants.

## IV.     PARTIES

**Plaintiffs**

55.     Plaintiff Michael Gathen resides in Niskayuna, New York. On December 12, 2023, Plaintiff Gathen went shopping at the Polo Factory Store located at 1424 State Route 9 #3, Lake George, NY 12845. In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Gathen purchased the following items from this Polo Factory Store on December 12, 2023:

| No. | Item | False Reference Price | First-Level Purported Discount | Second-Level Purported Discount[49] | Purchase Price |
|---|---|---|---|---|---|
| 1 | G7-16 CAS<br>SKU 885031547928 | $49.50 | 40% Off<br>($19.80) | 30% Off<br>($8.91) | $20.79 |
| 2 | FLC HOOD<br>SKU 888978466635 | $59.50 | 40% Off<br>($23.80) | 30% Off<br>($10.71) | $24.99 |
| 3 | FLC PNT, 8<br>SKU 88978466512 | $49.50 | 40% Off<br>($19.80) | 30% Off<br>($8.91) | $20.79 |
| 4 | G7-16 L/S,<br>SKU 885031547768 | $65.00 | 40% Off<br>($26.00) | 30% Off<br>($11.70) | $27.30 |
| 5 | Coats,<br>SKU 726113370754 | $330.00 | Promo Price:<br>$231.00<br>($99 whole dollar discount) | 30% Off<br>($69.30) | $161.70 |

56.     Plaintiff Gathen examined several items at the Polo Factory Store in Lake George, NY before deciding on what items to purchase. During his time there on December 12, 2023,

---

[49] Contrary to Defendants' representation since former plaintiff Ratra filed the original complaint in this action that none of the items offered for sale in its Polo Factory Store outlets are manufactured exclusively to be sold at Polo Factory Store outlets (not true) and that the ticketed reference prices refer to actual contemporaneous offerings of identical products at the mainline Ralph Lauren store or website (also not true)—even if both of those things were true, it does not explain away Defendants' use of second-level (and beyond) discounts at Polo Factory Stores. *See, e.g.,* ¶¶ 7, 65. More discovery is needed on the amount and frequency of multi-level discounts in Defendants' Polo Factory Stores.

In other words, even if the top line reference price on the price tag was a legitimate price for the same item in the mainline channel, second-level (and subsequent) discounts can then *only* reasonably mean former prices at *that* outlet store. See Inga v. Bellacor.com, Inc., No. 219CV10406MWFMRW, 2020 WL 5769080, at *3-4 (C.D. Cal. July 17, 2020) ("Notably, the presence of both 'Compare' and 'Regular' reference prices, in addition to a 'Sales Price,' could be read to suggest that [d]efendant formerly sold items at the 'Regular' price … [p]laintiffs provide sufficient factual content, based on a months-long investigation into [d]efendants' pricings practices, to support his allegation that '[n]one of the products were ever offered for sale at their respective advertised reference price.' … These allegations, coupled with consideration of the advertisements themselves, are sufficient to state a claim under the UCL, FAL, and CLRA … [p]laintiff provides the Court with relatively robust allegations and examples to support that he was deceived by a ***distinguishable*** scheme that employed false former prices, not unsubstantiated market prices.") (emphasis added) (internal citations omitted).

Plaintiff Gathen noticed numerous signs within the Polo Factory Store advertising various "__% Off" discounts on items throughout the store.[50]

57.    Indeed, after observing the items' "original" prices on their respective price tags (which are unaccompanied by any qualifying language whatsoever) and the accompanying discount signage, Plaintiff Gathen believed he was receiving a significant discount on the items he had chosen. His belief that the discounted prices on the items he had chosen were for a limited time and would not last was material and integral to his purchase decision.  He would not have made the purchases were it not for the significant bargain he thought he was receiving.  On all products, the advertised discounts were a material representation to him, and he relied on them in making his purchase decision. Plaintiff Gathen's receipt is attached hereto as **Ex. H**. It shows that he paid an after-tax total of $269.70 for the five items and received a total purported "savings" of $297.93. However, this purported savings was false and illusory.

58.    Plaintiff Gathen would not have made these purchases without Defendants' pricing misrepresentations. As a result, Plaintiff Gathen has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct. Aside from not receiving the benefit of the bargain (i.e., the promised value of the merchandise) through his reliance on Defendants' false reference pricing scheme, Plaintiff Gathen was injured because he paid an inflated price (i.e., price premium) for the merchandise as a result of Defendants' misconduct alleged herein.

59.    Plaintiff Dr. Ida Molayem resides in Beverly Hills, California. On November 12, 2023, Plaintiff Molayem went shopping at the Polo Factory Store in the Citadel Outlet mall located at 100 Citadel Drive, Suite 509, Los Angeles, CA 90040. In reliance on Defendants' false and

---

[50] *See, e.g.*, **Ex. A**, depicting extent of discount signs on display throughout Defendants' outlet stores.

deceptive advertising, marketing and discount pricing scheme, Plaintiff Molayem purchased the following items from this Polo Factory Store on November 12, 2023:

| Item No. | Item: | False Reference Price | Purported Discount | Purchase Price |
|---|---|---|---|---|
| 1 | M-COLD W SKU<br>SKU 804247229336 | $45.00 | 30% Off<br>($13.50) | $31.50 |
| 2 | WAFFLE CN<br>SKU 749862151115 | $69.50[51] | 30% Off<br>($14.59) | $34.06 |
| 3 | S/S SOLI<br>SKU 197078861128 | $38.50 | 30% Off<br>($11.55) | $26.95 |
| 4 | SS OTHER<br>SKU 885400858426 | $38.50 | 30% Off<br>($11.56) | $26.94 |
| 5 | SS OTHER<br>SKU 885400682861 | $38.50 | 30% Off<br>($11.55) | $26.95 |
| 6 | BASIC MES<br>SKU 883862513525 | $77.00 | 30% Off<br>($23.10) | $53.90 |
| 7 | S/S SOLI<br>SKU 197078861067 | $38.50 | 30% Off<br>($11.55) | $26.95 |

60.     Plaintiff Molayem examined several items at the Polo Factory Store at the Citadel Outlets before deciding on what items to purchase. During her time there on November 12, 2023, Plaintiff Molayem also noticed numerous signs within the Polo Factory Store advertising various "__% Off" discounts on items throughout the store.

61.     Indeed, after observing the items' "original" prices on their respective price tags (which are unaccompanied by any qualifying language whatsoever) and the accompanying discount signage, Plaintiff Molayem believed she was receiving a significant discount on the items she had chosen. Her belief that the discounted prices on the items she had chosen were for a limited time and would not last was material and integral to her purchase decision. She would not have

---

[51] **Ex. D** shows a reference price for this item of $79.50 on the Outlet Website. This discrepancy is likely due to Defendants' store changing the "discount" in the interim. As stated above, the reference prices listed on the Outlet Website typically match the in-store reference prices.

made the purchases were it not for the significant bargain she thought she was receiving. On all products, the advertised discounts were a material representation to her, and she relied on them in making her purchase decision. Plaintiff Molayem's receipt is attached hereto as **Ex. I**.

It shows that she paid an after-tax total of $250.53 for the seven items and received a total purported "savings" of $118.25. However, this purported savings was false and illusory.

62.     Plaintiff Molayem would not have made these purchases without Defendants' pricing misrepresentations. As a result, Plaintiff Molayem has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct. Aside from not receiving the benefit of the bargain (i.e., the promised value of the merchandise) through her reliance on Defendants' false reference pricing scheme, Plaintiff Molayem was injured because she paid an inflated price (i.e., price premium) for the merchandise as a result of Defendants' misconduct alleged herein.

63.     Plaintiff Keith White resides in Portland, Oregon. On September 30, 2023, Plaintiff White went shopping at the Polo Factory Store in the Woodburn Outlets mall located at 1001 Arney Road, #200, Woodburn, Oregon 97071. In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff White purchased the following items from this Polo Factory Store on September 30, 2023:

| Item No. | Item: | False Reference Price | Purported Discount | Second-Level Purported Discount | Third-Level Purported Discount | Fourth-Level Purported Discount | Purchase Price |
|---|---|---|---|---|---|---|---|
| 1 | Knit SKU 883862513228 | $110.00 | "Promo Price" $82.50 ($27.50 off) | 20% Off ($16.50) | $2.62 Off ("$10 off Combina") [52] | N/A | $63.38 ($66.00) |
| 2 | M-S/S SO SKU 19778023182 | $110.00 | "Promo Price" $59.99 ($50.01 off) | 25% Off ("TAA" discount) ($15.00) | 20% Off ($9.00) | $1.43 Off ($10 off Combina") | $34.56 ($35.99) |
| 3 | Shorts-M SKU 767325565057 | $89.50 | "Promo Price" $62.65 ($26.85 off) | 20% Off ($12.53) | $1.99 Off ($10 off Combina") | N/A | $48.13 ($50.12) |
| 4 | Solid FL SKU 197078545165 | $125.00 | 20% Off ($25.00) | $3.96 Off ($10 off Combina") | N/A | N/A | $96.04 ($100.00) |

64.     Plaintiff White examined several items at the Polo Factory Store at Woodburn Outlets before deciding on what items to purchase. During his time there on September 30, 2023, Plaintiff White also noticed numerous signs within the Polo Factory Store advertising various "__% Off" discounts on items throughout the store.

65.     Indeed, after observing the above items' "original" prices on their respective price tags (which are unaccompanied by any qualifying language whatsoever) and the accompanying discount signage, Plaintiff White believed he was receiving a significant discount on the items he had chosen. His belief that the discounted prices on the items he had chosen were for a limited time and would not last was material and integral to his purchase decision. He would not have made the purchases were it not for the significant bargain he thought he was receiving. On all products, the advertised discounts were a material representation to him, and he relied on them in making his purchase decision. Plaintiff White's receipt is attached hereto as **Ex. J**. It shows that

---

[52] This appears to be a $10 coupon distributed across the several items purchased. The parenthetical in the "Purchase Price" column shows the price without the application of this coupon. It is also backed out of the damages calculation in ¶ 79.

he paid an after-tax total of $242.11 for the four items and received a total purported "savings" of $192.48. However, this purported savings was false and illusory.

66.     Plaintiff White would not have made these purchases without Defendants' pricing misrepresentations. As a result, Plaintiff White has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct. Aside from not receiving the benefit of the bargain (i.e., the promised value of the merchandise) through his reliance on Defendants' false reference pricing scheme, Plaintiff White was injured because he paid an inflated price (i.e., price premium) for the merchandise as a result of Defendants' misconduct alleged herein.

### **Plaintiffs' Economic Injury Is Readily Quantifiable**

67.     Plaintiffs have been injured and incurred quantifiable actual damages as a result of Defendants' fraudulent pricing scheme, which can be and has been preliminarily calculated through the use of regression analysis.

68.     Plaintiffs overpaid for the products they purchased as described herein and it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiffs to overpay. Despite Plaintiffs' original beliefs that the products they purchased were discounted and, thus, that their value was significantly greater than the sale price for which they purchased them, Plaintiffs, in actuality, paid an *inflated* price for all of the supposedly discounted products they purchased. In other words, both the reference prices *and* the actual selling prices of the items Plaintiffs purchased were inflated, but for different reasons: the reference prices because Defendants intentionally fabricated them and the actual selling prices because if Defendants had not engaged in the false discounting scheme, then those items would not have commanded such high, i.e., *inflated*, prices. Thus, the items each Plaintiff purchased were all worth less than the amounts they paid for them.

69.     Plaintiffs were damaged in their purchases because Defendants' false reference price discounting scheme inflated the final selling price of the items they purchased, such that Defendants' false reference price discounting scheme caused Plaintiffs to pay a price premium. Defendants' false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendants not engaged in a false reference pricing scheme. Plaintiffs would not have purchased the merchandise, or would have paid less for it, but for Defendants' representations regarding the false reference prices and purported discounts of the merchandise. Plaintiffs were misled into believing that they were receiving substantial savings on the purchases of Defendants' products which was implied by the falsely advertised reference prices.

70.     Here, for purposes of its investigation and determining a preliminary measure of damages, Plaintiffs, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendants' product SKUs and pricing practices attached to each SKU. Plaintiffs, through the use of sophisticated regression analysis, were able to determine the objective measure by which Plaintiffs and Class members overpaid for the goods they purchased.[53]

71.     Reference guides on regression-based damages describe how "[p]ractitioners can use several tools to establish and measure relations among the variables that affect revenues and

---

[53] Notably, if the "misrepresentation ... artificially inflate[s] the market price of a product, causing [Plaintiffs] to pay more for it than [they] otherwise would have—regardless of whether [they] even saw the misrepresentation," the plaintiffs were "harmed [ ] by a misrepresentation without necessarily having relied on it." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *10 (S.D.N.Y. Aug. 13, 2020). Under this "theory of causation … that the advertising and labeling practice allowed a price premium to be charged" is often known as a "market-price-based theory of causation." *Id.* at *11 (citation and internal quotation marks omitted). This theory, "unlike the promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

costs, and thus establish the casual link … Regression analysis applies a statistical technique to develop an equation depicting the relation among variable and then uses that equation for prediction."[54] In this case, Plaintiffs' consultants utilized regression analysis to estimate the relationship between Defendants' reference prices and Defendants' selling prices, after accounting for the other factors that influence Defendants' pricing, and used that equation to predict prices that would have occurred but for misconduct in this case. As explained below, the regression analysis relies on Defendants' data and measures how selling prices increase when the intensity of their misconduct is greater (i.e. a higher reference price leads to higher selling price, holding all else equal).

72.    Plaintiffs' experts used the data collected during the investigation to analyze 142 products offered for sale within Defendants' Polo Factory Stores during the Class Period. The average selling price within this data sample was $83.25, whereas the average reference price was $127.31. Thus, on average, the reference price chosen by Defendants was $44.06 higher (or 52.9% higher) than the selling price.

73.    Plaintiffs' experts used this data as input (among additional control variables affecting price, described below) to perform a regression model which allowed them to calculate the price premium paid by Plaintiffs, and all similarly situated proposed Class members, for each product purchased. The regression model incorporates supply and demand factors through the use of *actual selling prices*, which are the net result of the competitive factors that influence Defendants' pricing. For example, the price of an item at issue in this case is a function of its component features (e.g., is the item a top or a dress? Is the item marketed towards women, girls, men, or boys?). The net effect of the demand factors (e.g., consumer willingness to pay for an item

---

[54] Roman L. Weil et al., *Litigation Services handbook: the role of the Financial Expert* Ch. 4, p. 25 (6th ed. 2017).

based on its features) and supply factors (e.g., Defendants' production costs) are captured within the product's attributes when actual selling prices are used in this type of regression analysis.

74.     While additional variables will be accounted for after more detailed data is provided by Defendants or elsewhere during discovery, ***this initial regression analysis already accounts for 11 variables that impact Defendants' pricing*** (including reference price). For example, the regression analysis accounts for product type (e.g., bottoms vs. tops vs. dresses vs. outerwear, etc.) and target demographic (e.g., women vs. men vs. girl vs. boy vs baby). After accounting for these product characteristics, the regression finds a coefficient of 0.6965. In other words, the regression finds that increasing the reference price by \$1 results in an increase of \$0.6965 (or approximately 70¢) in the selling price of items at Polo Factory stores.

75.     The corresponding regression equation is then used to predict selling prices if the reference price was reduced to the typical selling price of the item (i.e., lowering the reference price to remove the impact of the pricing misconduct). For example, as previously discussed, the preliminary data suggests Polo Factory Store reference prices were \$44.06 higher (or 52.9% higher) than the selling price, on average. When combined with the preliminary regression results described above, this \$44.06 differential implies that selling prices were approximately \$30.69 higher, on average, due to the alleged false discounting scheme.[55] This average overcharge of \$\$30.69 represents approximately 36.8% of the average purchase price within the data collected by Plaintiffs.[56]

76.     These results will be revised once Plaintiffs receive additional pricing data (i.e., daily histories of reference and sale prices for many more SKUs during the Class Period), but even

---

[55] That is, 0.6965 x \$44.06 = \$30.69.

[56] \$30.69 / \$83.25 = 36.8%.

the data collected by Plaintiffs' counsel demonstrates that Plaintiffs and others similarly situated paid a price premium as a direct result of the false discounting scheme practiced universally at Polo Factory Stores. Plaintiffs will seek in-depth discovery of internal documents, digitally stored historic pricing data, and depositions of persons most knowledgeable about Defendants' practices to supplement this investigation, show common injury at class certification, and prove damages with reasonable certainty at trial.

77.     The table below shows the application of the preliminary regression coefficient (0.5116) to items purchased by Plaintiffs and the resulting measure of injury.[57]

| Plaintiff | Item | Delta (Δ) Between Reference Price and Actual Sale Price | Coefficient | Damages[58] (Δ x 0.6965) |
|---|---|---|---|---|
| Gathen | G7-16 CAS SKU 885031547928 | $28.71 | 0.6965 | $20.00 |
| | FLC HOOD SKU 888978466635 | $34.51 | 0.6965 | $24.04 |
| | FLC PNT, 8 SKU 88978466512 | $28.71 | 0.6965 | $20.00 |
| | G7-16 L/S, SKU 885031547768 | $37.70 | 0.6965 | $26.26 |
| | Coats, SKU 726113370754 | $168.30 | 0.6965 | $117.22 |
| Molayem | M-COLD W SKU SKU 804247229336 | $13.50 | 0.6965 | $9.40 |
| | WAFFLE CN SKU 749862151115 | $35.44 | 0.6965 | $24.68 |
| | S/S SOLI SKU 197078861128 | $11.55 | 0.6965 | $8.04 |

---

[57] This exercise can be performed for every product Defendants have sold at Polo Factory stores at a purported discount by multiplying the regression coefficient by that item's reference price/sales price differential. Once enough historical pricing and sales data is provided to Plaintiffs' experts to perfect the regression coefficient, measuring the harm to each Class member will be a simple mechanical exercise.

[58] The figures in this column are rounded to the nearest hundredth.

| Plaintiff | Item | Delta (Δ) Between Reference Price and Actual Sale Price | Coefficient | Damages[58] (Δ x 0.6965) |
|---|---|---|---|---|
| | SS OTHER SKU 885400858426 | $11.56 | 0.6965 | $8.05 |
| | SS OTHER SKU 885400682861 | $11.55 | 0.6965 | $8.04 |
| | BASIC MES SKU 883862513525 | $23.10 | 0.6965 | $16.09 |
| | S/S SOLI SKU 197078861067 | $11.55 | 0.6965 | $8.04 |
| White[59] | Knit SKU 883862513228 | $44.00 | 0.6965 | $30.65 |
| | M-S/S SO SKU 19778023182 | $74.01 | 0.6965 | $54.55 |
| | Shorts-M SKU 767325565057 | $39.38 | 0.6965 | $27.43 |
| | Solid FL SKU 197078545165 | $25.00 | 0.6965 | $17.41 |

78.     The harm to Plaintiffs and Class members (i.e., price premium) caused by Defendants' misconduct can also be objectively measured through the use of conjoint analysis supported by Defendants' historic pricing, sales, and other market data, which will also be pursued vigorously in discovery, to isolate the price premium associated with Defendants' false reference price and discounting scheme.

79.     Conjoint analysis is a well-accepted survey-based technique in which survey participants select their most preferred product from a series of product options with different attributes (including price).[60] The researcher will then analyze consumers' trade-offs among

---

[59] As stated *supra* in n.52, Plaintiff White's $10 coupon, which was distributed across each of his products, has been backed out of the damages calculation.

[60] "The key characteristic of conjoint analysis is that respondents evaluate product profiles composed of multiple conjoined elements (attributes or features). Based on how respondents evaluate the combined elements (the product concepts), we deduce the preference scores that they

products with different features using a statistical model that allows the researcher to estimate the influence of each product attribute and the willingness-to-pay ("WTP") for a particular product attribute. In other words, conjoint analysis can establish the extent to which consumer preferences (i.e., consumer demand, or WTP) change due to the alleged misconduct (i.e., false reference and discounting scheme) and, further, quantify its monetary impact on actual selling prices. After measuring the change in consumer preferences (and WTP) due to the alleged misconduct in this case, an overcharge is calculated by then incorporating *supply*-side behavior.

80.    As with hedonic regression, Plaintiffs can put forth an expert-based conjoint analysis with and/or without an economic market simulation to account for supply side factors[61]

---

might have assigned to individual components of the product that would have resulted in those overall evaluations" (Orme, B. "A Short History of Conjoint Analysis." Chapter 4 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Second Edition, Madison, WI: Research Publishers LLC, 2010, p. 29).

[61] An economic market simulation estimates market prices by fully incorporating the relevant supply and demand information to estimate the but-for market prices that would have been paid by consumers in the absence of the alleged misconduct. It is used to incorporate supply side factors into the but-for world in which consumers' WTP has adjusted due to the absence of the alleged misconduct. Market simulations often incorporate (and are calibrated to) real-world supply and demand market data on the Defendants' (and competitor's) products, prices, costs, market share, consumer decisions (*e.g.*, mixed logit coefficients from conjoint analysis), and the price elasticity of consumer demand. Indeed, a wide body of academic literature in the economics discipline describes combining the consumer demand side of the market with the supply side of the market to determine market equilibrium prices. For example, Steven Berry, et al., Automobile Prices in Market Equilibrium, 63 *Econometrica* 841 (1995); Aviv Nevo, A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, 9 *Journal of Economic and Management Strategy* 513-548 (2000); Steven Berry, et al., Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market, 112 *Journal of Political Economy* 68-105 (2004); Petrin, Amil, Quantifying the Benefits of New Products: The Case of the Minivan, 110 *Journal of Political Economy* 705–729 (2002); Greg Allenby, et al., Valuation of Patented Product Features, 57 *The Journal of Law & Economics* 629-663 (2014). Within the context of consumer class action litigation, various courts have accepted damages models based on economic market simulations that incorporate the findings of a conjoint analysis with additional supply-side factors. *See, e.g., Wesley Won et al. v. General Motors, LLC*, No. 2:19-cv-11044 (DML) (DRG) (E.D. Mich., July 28, 2022); *Thomas Allegra et al. v. Luxottica Retail North America, d/b/a* Lenscrafters, No. 17 CV-5216 (PKC) (RLM) (E.D.N.Y., Dec. 13, 2021); *Riley Johannessohn, et al. v. Polaris Industries*, Inc., No. 16-cv-03348 (NEB/LIB) (D. Minn.,

that will likewise demonstrate the price premium paid on products with inflated reference prices as compared to those without inflated reference prices. This approach will isolate the economic harm to Class members due solely to Defendants' misconduct and will demonstrate that otherwise identical products sold *without* reference prices ultimately cost less.

81.    Accordingly, objective measures demonstrate that Plaintiffs overpaid for the Polo Factory Store merchandise they purchased. The difference between the actual sales price paid by Plaintiffs due to the artificially increased demand for the products—caused by Defendants' false discounting scheme—and the market sale price that the products would have commanded without Defendants' misconduct provides an objective measure by which Plaintiffs were overcharged and injured by Defendants. The amount of inflation of the prices for the Polo Factory Store merchandise Plaintiffs purchased caused by Defendants' deception thus measures how much Plaintiffs overpaid. As shown above, this amount can be quantified using regression analysis based on Defendants' historic pricing data and/or through conjoint analysis (with or without a market simulation). Plaintiffs' allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co., Inc*., 94 N.Y.2d 43, 56 (1999). *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase") (emphasis added).

### Plaintiffs Have Standing for Injunctive Relief and Lack An Adequate Remedy at Law

82.    Plaintiffs are also susceptible to the same harm reoccurring, and therefore require an injunction (i.e., Plaintiffs lacks an adequate remedy at law), because they cannot be certain that Defendants will have corrected this deceptive pricing scheme, and they desire to shop at

---

Mar. 31, 2020) ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world").

Defendants' Polo Factory Stores in the future because they like the brand and the clothing styles offered. Further, due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Polo Factory Stores, Plaintiffs will be unable to parse what prices are inflated and untrue, and what prices are not. Plaintiffs simply do not have the resources to ensure that Defendants are complying with California, New York, Oregon, and federal law with respect to their pricing, labeling, and/or advertising of Polo Factory Store outlet merchandise.

83.     Further, because of the wide selection of merchandise available at Defendants' Polo Factory outlet stores, the sheer volume of products involved in Defendants' deceit (i.e., on information belief, virtually all of them), and the likelihood that Defendants may yet develop and market additional Polo Factory Store outlet merchandise items for sale, Plaintiffs may again, by mistake, purchase a falsely discounted product at one of the Polo Factory Stores under the reasonable, but false, impression that Defendants had corrected the scheme and that their reference price advertisement represented a *bona fide* former price at which the item was previously offered for sale by Defendants. However, without a substantial, time-consuming, and costly investigation, Plaintiffs will have no way of knowing whether Defendants have deceived them again.

84.     Absent an equitable injunction enjoining Defendants from continuing in the unlawful course of conduct alleged herein, Plaintiffs, Class members, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendants' ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiffs, Class members, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiffs, as well as California, New York, and Oregon consumers at large, the appropriate assurances.

85.    Plaintiffs additionally lack an adequate remedy at law with respect to claims for equitable restitution because they have not yet retained an expert to perform the damages model that will determine whether an award of actual damages can or will adequately remedy monetary losses versus what an award of equitable restitution would provide. For instance, legal damages tend to focus on remedying the actual out-of-pocket monetary loss (reliance damages) or loss in an expectancy (benefit of the bargain damages). Equitable restitution, on the other hand, focuses distinctly on restoring monies wrongly *acquired* by the defendant. For instance, Plaintiff Molayem lacks an adequate remedy at law to the extent she and California Class members have suffered damages as measured by the difference between the price paid and the value represented (i.e., benefit of the bargain damages), California law prohibits consumers from recovering that measure of damages, but it does not prohibit them from recovering that measure as equitable relief. *See* Cal. Civ. Code § 3343. Accordingly, at this juncture, Plaintiffs can, and do, credibly allege that legal damages are inadequate as they do not know whether the model for actual damages (as opposed to restitution) will even be viable or cover the same amount of harm.[62]

86.    Plaintiff Molayem further lacks an adequate remedy at law because the UCL (an equitable cause of action) carries a statute of limitations of four years, while the CLRA (which can provide legal damages *and* equitable restitution) carries a shorter, three-year statute of limitations. Cal. Bus. & Prof. Code § 17208; Cal. Civ. Code § 1783. Thus, dismissal of Plaintiff Molayem's

---

[62] Decisions in numerous false discounting cases have accepted similar allegations where the defendant has challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g.*, *Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021)*; Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10.

(equitable) UCL claims would wipe out an entire year's worth of monetary recovery for the California Class.

87.     Finally, Plaintiff Molayem lacks an adequate remedy at law because the UCL "sweeps more broadly than the CLRA." *Allen v. Hylands, Inc.*, 773 F. App'x 870, 874 (9th Cir. 2019). While Plaintiff Molayem's claim under the "fraudulent" prong of the UCL is subject to the same "reasonable consumer" test as the CLRA, her claim under the "unfair" prong is more far-reaching, and, as alleged below, liability may be found if Defendants' practices "offended an established public policy of transparency in pricing" or are "immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers." These tenets of liability seek to remediate broader harm for which there is no corollary under the CLRA, making legal damages inadequate. Accordingly, Plaintiffs may set forth alternate claims for legal damages and equitable restitution.

**<u>Defendants</u>**

88.     Plaintiffs are informed and believe, and upon such information and belief allege, that Defendant Ralph Lauren Corporation is a Delaware corporation with its principal executive offices in New York, New York.

89.     Plaintiffs are informed and believe, and upon such information and belief allege, Defendant Ralph Lauren Retail, Inc. is a Delaware corporation with its principal executive offices in New York, New York.

90.     Defendants operate Ralph Lauren and related outlet Polo Factory outlet stores as well as the ralphlauren.com website, and advertise, market, distribute, and/or sell clothing and clothing accessories throughout California, New York, Oregon, and the United States.

91.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is in some manner legally responsible for the damages suffered by Plaintiffs and the Class members as alleged herein.  Plaintiffs will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

92.     Defendants know that their reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California, New York, Oregon, and federal law. Defendants fraudulently concealed from and intentionally failed to disclose to Plaintiffs and other members of the proposed Classes the truth about their advertised discount prices and former/reference prices. Defendants concealed from consumers the true nature and quality of the products sold at their Polo Factory outlet stores. Defendants intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiffs and the proposed Classes to purchase Polo Factory outlet products in their stores. At all relevant times, Defendants have been under a duty to Plaintiffs and members of the proposed Classes to disclose the truth about its false discounts.

## V.     CLASS ALLEGATIONS

93.     Plaintiffs brings this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants:

**California Class**

All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from

a Polo Factory outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

**New York Class**

All persons who, within the State of New York and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Polo Factory outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

**Oregon Class**

All persons who, within the State of Oregon and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Polo Factory outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Classes are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more classes, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

94.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs.

95.     ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.      whether, during the Class Period, Defendants used false advertised reference prices on their Polo Factory outlet product labels and falsely advertised price discounts on merchandise sold in their Polo Factory outlet stores;

b.      whether Defendants ever offered items for sale or sold items at their advertised reference price;

c.      whether, during the Class Period, any of the original prices advertised by Defendants were false or misleading;

d.      whether Defendants' purported sale prices advertised in their Polo Factory outlet stores reflected any actual discounts or savings;

e.      whether Defendants' purported percentage-off discounts advertised in their Polo Factory outlet stores reflected any actual discounts or savings;

f.      whether Defendants' alleged conduct constitutes violations of the laws asserted;

g.      whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

h.      whether Plaintiff White and Oregon Class members are entitled to statutory damages pursuant to ORS § 646.638 et seq. and the proper measure of those damages

i.      whether Plaintiffs and Class members are entitled to damages and the proper measure of that loss; and

j.      whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparison.

96.     *Typicality*: Plaintiffs' claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by

Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

97.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interest to those of the Classes.

98.    *Superiority*: The nature of this action and the nature of laws available to Plaintiffs and the Classes make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Classes for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

99.    All Class members, including Plaintiffs, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, advertising scheme, disseminated in a years-long campaign to New York, California, and Oregon consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Classes. In addition, it can be reasonably presumed that all Class members, including Plaintiffs, affirmatively acted in response to the

representations contained in Defendants' false advertising scheme when purchasing merchandise sold at Polo Factory outlet stores.

100.    Plaintiffs are informed that Defendants keep extensive computerized records of their Polo Factory outlet customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
**(On Behalf of Plaintiff Molayem and the California Class)**

101.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

102.    Plaintiff Molayem brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

103.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

104.    The UCL imposes strict liability. Plaintiff Molayem and members of the proposed California Class need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

105.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

106.    Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendants' acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

107.    The harm emanating from this practice to Plaintiff Molayem and members of the proposed California Class outweighs any utility it provides because Defendants' practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

108.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

109.    Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived Plaintiff Molayem and members of the proposed California Class and are highly likely to deceive members of the consuming public. Plaintiff Molayem and members of the proposed California Class relied on Defendants' fraudulent and deceptive

representations regarding its false or outdated "original prices" for products sold by Defendants at their Polo Factory outlet stores. These misrepresentations played a substantial role in Plaintiff Molayem and members of the proposed California Class's decision to purchase the product at a purportedly steep discount, and Plaintiff Molayem and members of the proposed California Class would not have purchased the product without Defendants' misrepresentations.

### *"Unlawful" Prong*

110.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

111.    Defendants' act and practices alleged above constitute unlawful business acts or practices as Defendants have violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendants', are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - ***for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that

> a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

112.    As detailed in Plaintiff Molayem's Second Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

113.    As detailed herein, and for the same reason that Defendants' acts and practices violate the UCL and FTCA, they also violate the CLRA.

114.    Defendants' practices, as set forth above, misled Plaintiff Molayem, the proposed California Class, and the public in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

115.    Defendants' violations of the UCL, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff Molayem, members of the proposed California Class, and the public, who, if Defendants' false pricing scheme is permitted to continue, will be deceived into purchasing products based on illegal price comparisons. These false comparisons created phantom markdowns and led to financial harm for consumers like Plaintiff Molayem and the members of the proposed California Class as described herein. Because of the surreptitious nature of Defendants' deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendants' practice.

116.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff Molayem and members of the proposed California Class are entitled to preliminary and permanent injunctive relief enjoining

Defendants from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff Molayem and the proposed California Class of all Defendants' revenues wrongfully obtained from them as a result of Defendants' unfair competition, or such portion of those revenues as the Court may find equitable.[63]

## SECOND CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, *et seq.***
***(On Behalf of Plaintiff Molayem and the California Class)***

117. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

---

[63] California permits broad discretion to fashion remedies as needed, and "the appropriate measure of recovery [under the equitable provisions of California's consumer protection laws] depends on the nature of the case and the alleged harm that [a plaintiff] suffers." *Le v. Kohls Department Stores, Inc.*, 160 F. Supp. 3d 1096, 1104 (E.D. Wis. Feb. 8, 2016). "California's consumer protection laws…authorize multiple forms of restitutionary recovery." *Id.* at 1105; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("[I]n calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information."); *Jacobo v. Ross Stores, Inc.*, No. CV-15-04701-MWF-AGR, 2016 WL 3482041, at *7 (C.D. Cal. Feb. 23, 2016) ("Remedy for the alleged misconduct is not limited to the difference between the value of the goods [p]laintiffs purchased and the price for those goods.*"); Russell v. Kohl's Dep't Stores, Inc.*, No. ED CV 15-1143 RGK (SPx), 2015 WL 12781206, at *3-4 (C.D. Cal. Oct. 6, 2015) (explaining why cost minus value is not the exclusive method of measuring restitution); *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO (RNBx), 2015 WL 1526559, at *4 (C.D. Cal. Mar. 23, 2015) ("[A]lthough California case law makes clear that [cost minus value] can be a measure of restitution, defendant has not cited, nor has the court found, any authority indicating that is the only way restitution can be calculated."); *Johns v. Bayer Corp.*, No. 09-cv-1935-AJB (DHB), 2012 WL 1520030, at *5 (S.D. Cal. Apr. 30, 2012) (finding that neither In re Vioxx nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution"); *Stathakos,* 2016 WL 1730001, at *4 (challenge to restitution methodology premature at motion to dismiss stage); *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015) (explaining that *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) did not limit measuring restitution to the price/value differential).

118.    Plaintiff Molayem brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of the CLRA, Cal. Civ. Code § 1750, *et seq*.

119.    Plaintiff Molayem and each member of the proposed California Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendants' sale of products at their Polo Factory outlet stores were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff Molayem and members of the proposed Class are "goods" or "services" within the meaning of Cal. Civ. Code §§ 1761(a) - (b).

120.    Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff Molayem and members of the proposed California Class which were intended to result in, and did result in, the sale of products sold at their Polo Factory outlet stores:

- advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

- making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

121.    Plaintiff Molayem is a consumer who has suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendants' use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff Molayem therefore seeks an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper. Plaintiff Molayem additionally seeks costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

122.    On June 25, 2024, former plaintiff Sarah Ratra, through counsel, sent a CLRA demand letter to Defendants that provided notice of Defendants' violation of the CLRA and demanded Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and

deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, that a complaint seeking damages would be pursued in accordance with the CLRA.

123.    Defendants failed to respond appropriately to that notice, nor did they agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of the written notice, as prescribed by § 1782. Therefore, Plaintiffs further seek actual, consequential, punitive and statutory damages, as appropriate, against Defendants, as permitted under the CLRA.[64]

124.    Filed concurrently herewith is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

### THIRD CAUSE OF ACTION

**Violation of the New York Consumer Protection From Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. GEN. BUS. LAW § 349, *et seq.***
***(On Behalf of Plaintiff Gathen and the New York Class)***

125.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

126.    Plaintiff Gathen brings this claim individually and on behalf of the members of the proposed New York Class against Defendants for violations of the New York Deceptive Acts and Practices Act ("NYDAPA"), N.Y. Gen. Bus. Law § 349.

127.    NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

---

[64] Plaintiff Molayem separately intends to send a letter notifying Defendants of these violations on October 1, 2024.

128.    Plaintiff Gathen and members of the proposed New York Class are "persons" under NYDAPA, N.Y. Gen. Bus. Law § 349(h), and Defendants' actions as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

129.    In the course of its business, Defendants advertised false reference prices that gave consumers, including Plaintiff Gathen and members of the proposed New York Class, the impression that their products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendants' outlet stores were worth more than they actually were.

130.    Plaintiff Gathen and members of the proposed New York Class had no way of discerning that Defendants' representations were false and misleading.

131.    Defendants thus violated and continue to violate NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, give the false impression that the products sold at Defendants' outlet stores are worth more than they actually are.

132.    Defendants knew or should have known that their conduct violated NYDAPA and owed a duty to Plaintiff Gathen and members of the proposed New York Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about their false discounts.

133.    Defendants intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of its apparel and retail products with intent to mislead Plaintiff Gathen and members of the proposed New York Class.

134.    Defendants' misleading and false advertisements were material to Plaintiff Gathen and members of the proposed New York Class, as they relate to the price of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such

representations and would be induced to act thereon in deciding whether or not to purchase the product.

135.    Defendants' unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff Gathen and members of the proposed New York Class, about the price of their apparel and other retail products. Plaintiff Gathen and members of the proposed New York Class reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the apparel and retail products from Defendant's retail stores. Plaintiff Gathen and members of the proposed New York Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the products.

136.    Defendants' violation of NYDAPA, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Gathen, members of the proposed New York Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff Gathen and members of the proposed New York Class.

137.    As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff Gathen and members of the proposed New York Class suffered ascertainable loss and actual damages.

138.    Plaintiff Gathen and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including, but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever

is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## FOURTH CAUSE OF ACTION

**Violation of the New York False Advertising Law ("NYFAA")**
**N.Y. GEN. BUS. LAW § 350,** *et seq.*
*(On Behalf of Plaintiff Gathen and the New York Class)*

139.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

140.    Plaintiff Gathen brings this claim individually and on behalf of the members of the proposed New York Class against Defendants for violations of the New York False Advertising Act ("NYFAA"), N.Y. Gen. Bus. Law § 350.

141.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350(a).

142.    Defendants' routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendants' outlet stores were worth more than they actually were.

143.    Defendants intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of their apparel

and retail products with intent to mislead Plaintiff Gathen and members of the proposed New York Class.

144.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Gathen and members of the proposed New York Class, about the price of their apparel and retail products. Plaintiff Gathen and members of the proposed New York Class reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the apparel and retail products from Defendants' outlet stores. Plaintiff Gathen and members of the proposed New York Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the product.

145.    Defendants' violation of the NYFAA, through their unlawful, unfair, and fraudulent business practices, are ongoing and presents a continuing threat that Plaintiff Gathen, members of the proposed New York Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff Gathen and members of the proposed New York Class.

146.    As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff Gathen and members of the proposed New York Class suffered ascertainable loss and actual damages.

147.    Plaintiff Gathen and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including, but not limited to, injunctive relief, recovery of actual damages and/or five hundred dollars per violation, whichever

is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### FIFTH CLAIM FOR RELIEF

**Violation of Oregon's Unlawful Trade Practices Act ("UTPA")**
**OR. REV. STAT. § 646.605, *et seq.***
***(On Behalf of Plaintiff White and the Oregon Class)***

148.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

149.    Plaintiff White brings this claim individually and on behalf of the members of the proposed Oregon Class against Defendants for violations of the UTPA, ORS § 646.605 *et seq.*

150.    The UTPA is Oregon's principal consumer protection statute. As the Supreme Court of Oregon has explained:

> The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself. It allows recovery of actual damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. . . . The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit . . . . the legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute.

*Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or. 127, 134–36, 690 P.2d 488 (1984). A private plaintiff may also seek an injunction "as may be necessary to ensure cessation of unlawful trade practices." ORS § 646.636.

151.    Defendants are each a "person," as defined by ORS § 646.605(4). Defendants are engaged in "trade" and "commerce" in Oregon by offering for sale goods with reference prices and discounts that directly or indirectly affect the people of Oregon, as defined by ORS

§ 646.605(8). The outlet products advertised by Defendants with reference prices and discounts are "goods" that are or may be obtained primarily for personal, family or household purposes, as defined by ORS § 646.605(6). Defendants' representations of reference prices and discounts in their outlet stores are "advertisements" as defined by ORS § 646.881(1). Defendants' use of reference prices and advertised discounts are "price comparisons" as defined by ORS § 646.881(2).

152.    Plaintiff White and the Oregon Class members purchased the goods advertised by Defendants with reference prices and discounts for personal, family or household purposes.

153.    The unlawful methods, acts and practices pled herein were committed in the course of Defendants' business. ORS § 646.608(1).

154.    Defendants' unlawful methods, acts and practices pled herein were "willful violations" of ORS § 646.608 because Defendants knew or should have known that their conduct was a violation, as defined by ORS § 646.605(10).

155.    Defendants' reference prices are representations of Defendants' own "former prices," as defined by ORS § 646.885.

156.    Defendants' methods, acts and practices, including Defendants' misrepresentations, active concealment and failures to disclose, violated and continue to violate the UTPA in ways including, but not limited to, the following:

- Defendants represented their goods had characteristics or qualities that the goods did not have (specifically, Defendants represented that the goods had a value equal to the reference price, when in fact they did not and instead had a much lower true value) (ORS § 646.608(1)(e));

- Defendants advertised their goods with intent not to provide the goods as advertised (specifically, Defendants represented that the goods had a value equal to the reference price, when in fact they did not and instead had a much lower true value— even lower than the "discounted" actual sales price) (ORS § 646.608(1)(i));

- Defendants made false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions (ORS § 646.608(1)(j));

- Defendants engaged in price comparison advertising in violation of ORS § 646.883(2) by failing to comply with ORS § 646.608(1)(j) and ORS § 646.608(4) (ORS § 646.608(1)(ee));

- Defendants engaged in price comparison advertising in violation of ORS § 646.885(2) by using terms such as "____ percent discount," "$____ discount," "____ percent off" and/or "$____ off" where the reference price was not in fact Defendant's own former price (ORS § 646.608(1)(ee)); and

- Defendants engaged in other unfair or deceptive conduct in trade or commerce, as described herein (ORS § 646.608(1)(u); ORS § 646.608(4)).

157. With respect to omissions, Defendants at all relevant times had a duty to disclose the information in question because, inter alia: (a) Defendants had exclusive knowledge of material information that was not known to Plaintiff White and the proposed Oregon Class; (b) Defendants concealed material information from Plaintiff White and the proposed Oregon Class; and/or (c) Defendants made partial representations which were false and misleading absent the omitted information.

158. Defendants' misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

159. Defendants' misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

160. Defendants engaged in the reckless or knowing use or employment of the unlawful methods, acts or practices alleged herein which have been declared unlawful by ORS § 646.608.

161. As a direct, substantial and/or proximate result of Defendants' conduct, Plaintiff White and the Oregon Class members suffered compensable and ascertainable losses.

162.    Plaintiff White and the Oregon Class members would not have purchased the products at the prices they paid if they had known that the advertised reference prices and discounts were false.

163.    Defendants' false reference pricing scheme fraudulently increased demand from consumers. This fraud artificially raised consumer demand for Defendants' merchandise, thereby shifting the demand curve outward and enabling Defendants to charge higher prices than they otherwise could have charged.

164.    The products that Plaintiff White and Oregon Class members purchased were not, in fact, worth as much as Defendants represented them to be worth, or the actual sales price that Plaintiff White and Oregon Class members paid for them.

165.    Plaintiff White seeks on behalf of himself and the Oregon Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages; (3) appropriate equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to ORS § 646.638 *et seq.*

166.    The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendants' conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff White seeks an order enjoining Defendants from committing such unlawful practices pursuant to ORS § 646.638(8)(c); ORS § 646.636.

167.    The balance of the equities favors the entry of permanent injunctive relief against Defendants. Plaintiff White, the Oregon Class members, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendants. Plaintiff White, the Oregon Class members, and the general public lack an adequate remedy at law. A permanent

injunction against Defendants is in the public interest. Plaintiff White is informed and believes and thereon alleges that Defendants' unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendants will or may continue to injure Plaintiff White and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendants' unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

168.    Defendants' conduct has caused substantial injury to the general public. Plaintiff White individually seeks public injunctive relief to protect the general public by putting an end to Defendants' false reference price advertising, false discounts and omissions.

169.    This action was brought "within one year after the discovery of the unlawful method, act or practice." ORS § 646.638(6). The applicable limitations period is expansive and extends back many years based on the "discovery" rule explicitly provided for in the Oregon Unlawful Trade Practices Act at ORS § 646.638(6). Defendants' unlawful false discounting practices have been pervasive at its Oregon stores—and at the core of its marketing plan—for many years (the exact length of time will be subject to discovery and proof).

170.    Plaintiff White and the Oregon Class members did not know, and could not have known, that these reference prices and discount representations were false. As the Oregon Supreme Court has explained, "[i]n general terms, a cause of action does not accrue under the discovery rule until the claim has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith* 328 Or. 420, 428, 980 P.2d 141 (1999); *see also Saenz v. Pittenger*, 78 Or.App. 207, 211–12, 715 P.2d 1126 (1986) (UTPA statute of limitations begins running when plaintiff knows or should have known of the allegedly unlawful conduct).

171.    Plaintiff White first learned of Defendants' false advertising scheme, and that he was likely a victim of the scheme, on or about June 3, 2024. Prior to that date, Plaintiff White was not aware of Defendants' false discount advertising scheme and was not aware that the reference prices and discounts Defendants had previously advertised to him and upon which he had relied in purchasing his products were false. Even though Plaintiff White became aware of Defendants' false advertising scheme on or about June 3, 2024, it stands to reason that all, or nearly all, other Class members are *still* unaware of Defendants' deception.

172.    By Defendants' design, their false advertising scheme by its very nature is hidden and virtually impossible for the typical consumer to discover. Consumers who shopped at Defendants' stores have no reasonable or efficient way of knowing the true daily price histories and past selling prices for the products they viewed and purchased without substantial, time-consuming, and costly investigation. Thus, Oregon consumers have, and for years have had, no way to know that the prices printed on the product price tags were fictitious and inflated and that the advertised discounts were false. Consumers have, and for years have had, no way to know that Defendants' false discounting practices extend across all, or virtually all, of Defendants' merchandise.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and on behalf of the other members of the Classes, requests that this Court award relief against Defendants as follows:

1.    an order certifying the Classes and designating Plaintiffs as the Class Representative and their counsel as Class Counsel;

2.    an order that the discovery rule, pursuant to, without limitation, ORS § 646.638(6), applies and that the applicable limitations period—and the corresponding

Class Period for the Oregon Class—extends back to the very first date that Defendants began engaging in the unlawful conduct alleged herein;

3.      awarding New York Class members all actual, punitive and statutory damages as permitted under the New York False Advertising Act and the New York Consumer Protection from Deceptive Acts and Practices Act;

4.      awarding Oregon Class members actual, punitive and statutory damages, as permitted under the Oregon Unlawful Trade Practices Act;

5.      awarding all other actual, punitive and/or statutory damages, as appropriate and according to proof;

6.      awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

7.      awarding declaratory and injunctive relief as permitted by law or equity, including: preliminarily and permanently enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

8.      retaining jurisdiction to monitor Defendants' compliance with permanent injunctive relief;

9.      ordering Defendants to engage in a corrective advertising campaign;

10.      awarding attorneys' fees and costs; and

11.      for such other and further relief as the Court may deem necessary or appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all of the claims so triable.

Dated: September 30, 2024

**LYNCH CARPENTER, LLP**

By:  _/s/ Scott G. Braden_

Scott G. Braden (*pro hac vice*)
scott@lcllp.com
Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Connor J. Porzio (*pro hac vice*)
connor@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:    619.762.1910
Facsimile:     858.313.1850

Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    412.322.9243

*Attorneys for Plaintiffs and*
*Proposed Classes Counsel*